**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-00841-WJM-NYW

RAY ANTHONY SMITH,

      Plaintiff,

v.

DEAN WILLIAMS,
SEAN PRUITT,
GINGER MIDDLETON,
CARLOS LOPEZ,
DR. MUHAMMAD MUNIR CHAUDRY, and
IFANCA,[1]

      Defendants.

---

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

---

Magistrate Judge Nina Y. Wang

      This matter comes before this court on two motions:

    (1)    CDOC Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(B)(1) and 12(B)(6) (the "CDOC Defendants' Motion to Dismiss") [Doc. 87,[2] filed March 18, 2021]; and

---

[1] The Second Amended Complaint names as a Defendant "Dr. Muhammad Munir Chaudry, Pres., IFANCA, The 'Halal Governing Body.'" [Doc. 86 at 1]. In their Motion to Dismiss, Dr. Chaudry and IFANCA state that, because it is unclear whether Plaintiff intended to name IFANCA or just Dr. Chaudry in this case, they construed Mr. Smith's filing broadly and proceeded as if IFANCA is a named Defendant in this matter. [Doc. 88 at 1 n.1]. In his Reply, Plaintiff confirms that he brings claims against both Dr. Chaudry and IFANCA. [Doc. 91 at 1].

[2] This court uses the convention [Doc. __] to refer to docket entries in the District of Colorado's Electronic Court Filing ("ECF") system. In addition, this court cites to the page numbers generated by the ECF system in referencing the Parties' filings.

(2)     Defendants Dr. Muhammad Munir Chaudry and The Islamic Food and Nutrition Council of America's Motion to Dismiss Plaintiff's Third Amended Prisoner Complaint (the "IFANCA Defendants' Motion to Dismiss") [Doc. 88, filed March 18, 2021] (collectively, the "Motions" or "Motions to Dismiss").

This court considers the Motions pursuant to 28 U.S.C. § 636(b), the Order Referring Case dated September 8, 2020 [Doc. 19], and the Memorandum dated May 3, 2021 [Doc. 97].  This court concludes that oral argument will not materially assist in the resolution of these matters.  Accordingly, upon review of the Motions, related briefing, and applicable case law, I respectfully **RECOMMEND** that (1) the CDOC Defendants' Motion to Dismiss be **GRANTED in part** and **DENIED in part** as set forth in this Recommendation, and (2) the IFANCA Defendants' Motion to Dismiss be **GRANTED**.

## BACKGROUND

This court draws the following facts from Plaintiff's Amended Operative Complaint (the "Second Amended Complaint") [Doc. 86][3] and presumes they are true for purposes of the instant Motions.  Plaintiff Ray Anthony Smith ("Mr. Smith" or "Plaintiff") is an inmate currently in the custody of the Colorado Department of Corrections ("CDOC") and housed at the Arkansas Valley Correctional Facility ("AVCF").  [Doc. 86 at 2].[4]  Mr. Smith is Muslim

---

[3] In a Recommendation dated February 22, 2021, this court noted that Plaintiff's original Complaint was designated on the court's docket as an amended complaint.  *See* [Doc. 82 at 3 n.3]; *see also* [Doc. 11 (the original Complaint)].  Mr. Smith filed his First Amended Complaint on August 24, 2020, [Doc. 17], and filed Plaintiff's Amended Operative Complaint on March 3, 2021 [Doc. 86], which remains the operative pleading in this action.  The court refers to this document as the Second Amended Complaint.

[4] Because the allegations in the Second Amended Complaint are not numbered by paragraph, this court refers to Plaintiff's allegations by the page on which they appear.

and has practiced Islam for 25 years.  [*Id.* at 20, 25]. Mr. Smith keeps a halal diet[5] for religious reasons, and his decision to keep a halal diet is motivated by his sincerely held religious beliefs.  [*Id.* at 12, 20].

This case primarily concerns the allegedly wrongful revocation of Mr. Smith's halal diet.  *See generally* [*id.*].  As an initial matter, Mr. Smith generally challenges the accuracy of the halal or non-halal designations of the food items on the CDOC's canteen list.  *See generally* [*id.* at 20 (Plaintiff asserting that "he cannot trust that what he orders from the canteen list is Halal.")].  Food items on the canteen list are generally marked with the signifier "(H)" to indicate an item's compliance with the halal diet.  [*Id.* at 7].[6]  According to Mr. Smith, there are food items on the list "that are marked (H) for Halal that are not Halal, and items that are not marked (H) for Halal that are Halal."  [*Id.*].  For example, Mr. Smith alleges that shrimp bowl soup is marked on the canteen list as halal but "has no Halal logo on the label" and "has an ingredient 'Powdered Chicken' which renders it not Halal certified."  [*Id.* at 11].  In addition, Plaintiff states that he "is accused of being in violation of the Religious Diet Participation Agreement [('RDPA')][7] for ordering" roast beef and gravy, which is not marked as halal, but asserts that the roast beef and gravy is, in

---

[5] "A Halal, or lawful, diet includes fruits, vegetables, seafood, and meat from herbivorous animals such as cows and chickens that are properly slaughtered."  *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1306 (10th Cir. 2010) (quoting *Williams v. Morton*, 343 F.3d 212, 215 (3d Cir. 2003)).

[6] In addition, kosher items are marked "(K)" and vegan items are marked "(V)."  [Doc. 86 at 7].

[7] The RDPA, attached to Plaintiff's Second Amended Complaint, provides that if an inmate violates the RDPA twice within a twelve-month period, the inmate will be terminated from the religious diet program for a period of twelve months.  [Doc. 86 at 3]. In evaluating the sufficiency of a complaint, the court may consider documents attached to the complaint.  *Indus. Constructors Corp. v. U.S. Bureau of Reclamation*, 15 F.3d 963, 964−65 (10th Cir. 1994).

fact, halal certified, and "even has the Halal logo on the package straight from the factory." [*Id.*].   In addition, Mr. Smith alleges that Muslims may eat kosher foods and maintain compliance with their halal diet, *see, e.g.*, [*id.* at 11, 12, 18], but asserts that he has been accused of violating the RDPA by ordering kosher-labeled foods.   [*Id.* at 11].

Plaintiff asserts that his halal diet was wrongfully canceled due to his purchase and/or consumption of certain foods being erroneously deemed violations of the RDPA. *See, e.g.*, [*id.* at 7].   Mr. Smith attributes the misclassification of foods, at least in part, to the CDOC's Service Operations Manager of Canteen Services, Defendant Ginger Middleton ("Ms. Middleton").   [*Id.* at 10].   Mr. Smith asserts that Ms. Middleton "committed fraudulent misrepresentation of a material matter when she failed to verify the items on the canteen list" and determine whether they were correctly marked or not marked as halal.   [*Id.*].

Relevant to Plaintiff's claims here, on December 3, 2019, Mr. Smith received a letter from Defendant Charlene Crockett ("Ms. Crockett"), the Food Service & Laundry Program Administrator for the CDOC, concerning an alleged violation of Plaintiff's halal diet.   [*Id.* at 9].   The letter stated that Plaintiff had violated the RDPA by ordering buffalo wing chips (which were marked as compliant with a kosher diet) and nacho tortilla chips (which were not marked for a specific diet).   [*Id.*].   The letter stated that this was Mr. Smith's first violation of the RDPA and that a second violation within one calendar year would result in the cancellation of Mr. Smith's halal diet.   [*Id.* at 10].   According to Plaintiff, prior to receiving this letter, "[t]here was no [explanation] given as to the reason the said [food] items were not permitted . . . so that Plaintiff could avoid ordering items with whatever [ingredients] made those items prohibited."   [*Id.*].

4

Plaintiff asserts that, after receiving the December 3, 2019 letter, he "inquired in the dining hall to Lt. Trujillo, Kitchen Lieutenant," ("Lieutenant Trujillo")[8] and that Lieutenant Trujillo "returned with a print-out of four items that [Plaintiff] ordered from [the canteen] on 12/18/2019 and said [that] 'this was the reason that [Plaintiff's] diet was [canceled].'"  [*Id.* at 16].  More specifically, Mr. Smith asserts that on January 21, 2020, he "went to the chow hal[l] for dinner and was informed by staff that [his] halal diet had been cut off" because the CDOC's Food Service Supervisor, Defendant Carlos Lopez ("Sergeant Lopez"), had reported to Ms. Crockett that Plaintiff had violated his halal diet by ordering buffalo wing chips, hot pepper cheese, "Sizzlin Sweet Mix," kettle corn, and chocolate caramels.  [Doc. 6 at 2].[9]  Mr. Smith then filed an Informal Grievance Form (the "Informal Grievance") on January 23, 2020, explaining that the Qur'an forbids only certain foods in an attempt to demonstrate that the buffalo wing chips or nacho chips "have nothing to do with violating the Halal diet."  [Doc. 86 at 16].  Lieutenant Trujillo responded to Plaintiff's Informal Grievance by generally setting forth the requirements of the halal diet.  [*Id.*].

Mr. Smith then filed a Step 1 Grievance on an unknown date, which included verses from the Qur'an.  [*Id.*].  An individual named Captain Wiggins, who is not a named

---

[8] Lieutenant Trujillo is not a named Defendant in this matter.  *See* [Doc. 86].

[9] Plaintiff has submitted to the court a copy of his Step 3 Grievance filed prior to initiating this lawsuit.  *See generally* [Doc. 6].  Typically, a court's review at the motion-to-dismiss stage is limited to the four corners of the operative complaint.  *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994).  However, the court may consider extraneous documents that are referenced in the operative complaint and which are central to the plaintiff's claims without converting the motion into one for summary judgment.  *See Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010).  Because the Second Amended Complaint references the Step 3 Grievance, *see, e.g.*, [Doc. 86 at 13], and because this document is central to Plaintiff's claims, the court considers this document in this Recommendation.

Defendant in this matter, responded to the Step 1 Grievance, stating that the Central Office had "investigated . . . and found you to be in violation of your canteen purchased with [respect] to your religious diet." [*Id.* at 17]. Captain Wiggins reminded Mr. Smith that "the canteen listing is clearly marked which items are halal and which [are] not," and also wrote that, because "this [was] [Mr. Smith's] second violation, [Mr. Smith's] [halal] diet was [canceled]." [*Id.*]. Plaintiff's Step 1 Grievance was denied. [*Id.*].

Plaintiff then filed a Step 2 Grievance on an unknown date, "quot[ing] the same scripture from the Holy Qur'an as before." [*Id.*]. Plaintiff received a response from an individual named Denny Stangier ("Mr. Stangier").[10] [*Id.*]. Mr. Stangier acknowledged that he had "received [Mr. Smith's] Step 1 and Step 2 Grievances and [his] requested remedy to have [his] Halal religious diet reinstated," but denied the Grievance on March 11, 2020 on the basis that Mr. Smith had "violated the expectations of maintaining [Plaintiff's] religious diet." [*Id.*]. Mr. Stangier informed Mr. Smith that he could reapply for reinstatement of the halal diet after January 21, 2021. [*Id.*]. That same day, Mr. Smith received another letter from Ms. Crockett informing Plaintiff that Sergeant Lopez had reported Plaintiff for violating his gastroesophageal reflux disease ("GERD") medical diet "by ordering foods with spices in them." [*Id.* at 13]. Mr. Smith asserts that Sergeant Lopez's report was made in retaliation for Plaintiff's filing the Step 1 and 2 Grievances. [*Id.*]. Plaintiff asserts that "medical [did not] discontinue [his GERD] diet" because the items he had ordered were halal, such as halal sausage, which is "hot and spicy," as well

---

[10] Mr. Smith also spells Mr. Stangier's surname as "Stengier." [Doc. 86 at 19]. The court uses the first-written spelling throughout this Recommendation.

as chili and spicy vegetable ramen noodle soups, "the only halal soups the canteen sells." [*Id.*].

Plaintiff then filed a Step 3 Grievance on March 13, 2020.  *See* [*id.* at 18]; *see also* [Doc. 6 at 2 (Plaintiff's Step 3 Grievance)].  In the Step 3 Grievance, Plaintiff requested that his halal diet be "restored immediately" and requested that Sergeant Lopez "stop harassing" him.  [Doc. 6 at 2].  The Step 3 Grievance was reviewed by non-Defendant Marshall Griffith ("Mr. Griffith"), who denied the Grievance on the basis that Mr. Smith's halal diet "ha[d] been [canceled] due to canteen violations," the first on December 4, 2019 and the second on January 21, 2020.  [Doc. 86 at 18].[11]  Mr. Griffith stated that "[c]anteen items are clearly marked for those items that are halal" and informed Mr. Smith that he could apply for reinstatement of his halal diet on January 21, 2021.[12]   [*Id.* (emphasis omitted)]; *see also* [Doc. 6 at 2].

Plaintiff alleges that, because his halal diet has been canceled, he has been required to eat "substitute meals" without red meat or poultry.  [*Id.* at 12].  Plaintiff asserts that the substitute meals "consist of peanut butter, or boiled eggs, or cheese slices ([processed]), or beans that are never fully cooked (partially raw)."  [*Id.*].  He asserts that the consumption of "any Halal food, including red meat (or fish or strawberries or any other Halal food God has provided) is one way in which Muslims may exercise their

---

[11] Mr. Smith also separately alleges that Mr. Stangier answered Plaintiff's Step 3 Grievance.  *See* [Doc. 86 at 19].

[12] Mr. Smith does not indicate in his Second Amended Complaint whether he reapplied for reinstatement of his halal diet or whether he is currently permitted to keep a halal diet while incarcerated.  [Doc. 86].  However, the court notes that Mr. Smith does not seek restoration of his halal diet in the Second Amended Complaint, [*id.* at 28], and his allegations suggest that he is currently permitted to consume his halal diet, as he states that he *was* without his halal diet for 246 days.  *See* [*id.*].  With this said, the CDOC Defendants do not argue that any of Mr. Smith's claims are moot.  *See* [Doc. 87].

religious beliefs," [*id.*], and asserts throughout the Second Amended Complaint that the cancellation of his halal diet has substantially burdened his religious practice, as he is either required to eat a non-halal diet, which violates his sincerely held religious beliefs, or choose to not eat. *See, e.g.*, [*id.* at 7, 12, 18]. Moreover, he asserts that Sergeant Lopez and Ms. Crockett have misapplied the RDPA's two-strikes policy and have "abuse[d] their authority [by] wrongfully discon[tinuing] Plaintiff's religious diet." [*Id.* at 23]. Finally, Mr. Smith asserts that the CDOC's Executive Director, Defendant Dean Williams ("Executive Director Williams"), has promulgated, implemented, and possessed responsibility for" the RDPA, which has "caused the complained of constitutional harm." [*Id.* at 5]; *see also* [*id.* at 6 (alleging that Executive Director Williams's failure to supervise resulted in a violation of Plaintiff's constitutional rights)].

On March 27, 2020, Plaintiff initiated this federal lawsuit. [Doc. 1]. The Honorable Gordon P. Gallagher directed Plaintiff to file his claims on the court-approved Prisoner Complaint form, *see* [Doc. 3], which Plaintiff did on April 24, 2020. [Doc. 11]. After Judge Gallagher identified deficiencies within Plaintiff's Prisoner Complaint and directed him to file an amended complaint, [Doc. 16], Mr. Smith filed his First Amended Complaint on August 24, 2020. [Doc. 17]. The case was then re-assigned to the presiding judge, the Honorable William J. Martínez, and drawn to the undersigned. [Doc. 18]. After the filing of two motions to dismiss, [Doc. 44; Doc. 65], Plaintiff filed a motion to amend his complaint. [Doc. 77]. This court granted the motion to amend on February 22, 2021,

[Doc. 82], and Plaintiff filed his Second Amended Complaint on March 3, 2021.  [Doc. 86].[13]

In the operative Second Amended Complaint, Mr. Smith raises claims against the following government actors: Director Williams; Sean Pruitt, the Warden at AVCF ("Warden Pruitt"); Ms. Middleton; Ms. Crockett; and Sergeant Lopez (collectively, the "CDOC Defendants").  [Doc. 86 at 2-4].  Generally, Plaintiff asserts that the CDOC Defendants have wrongfully interfered with his ability to practice his religion by wrongfully canceling his halal diet.  *See generally* [*id.*].  In addition, Plaintiff raises claims against the Islamic Food and Nutrition Counsel ("IFANCA"), the "Halal Governing Body," and Dr. Muhammad Munir Chaudry ("Dr. Chaudry"), the president of IFANCA (collectively the "IFANCA Defendants").  [*Id.* at 14].  As to the IFANCA Defendants, Plaintiff asserts that, because the IFANCA Defendants certify foods as both halal and kosher, [*id.* at 26], and because the CDOC "does not acknowledge that Kosher diets are lawful for Muslims and Halal diets are lawful for Jewish people, [this] is proof that [Dr. Chaudry], as the president of the 'Halal Governing Body' [and] IFANCA . . . [are] not following" Islamic law or the Qur'an.  [*Id.* at 18-19].

The court construes the Second Amended Complaint as raising the following claims: a claim pursuant to the Religious Land Use and Institutionalized Persons Act ("RLUIPA") against all Defendants, each in their individual and official capacities, ("Claim One"), [*id.* at 6, 25]; a § 1983 claim under the First Amendment Free Exercise Clause against all Defendants, each in their individual and official capacities ("Claim Two"), [*id.*

---

[13] The original motions to dismiss were denied as moot upon the filing of the Second Amended Complaint.  [Doc. 82; Doc. 89].

at 6, 25]; a First Amendment retaliation claim under § 1983 against Sergeant Lopez in his individual and official capacity ("Claim Three"), [*id.* at 25]; a § 1983 Fourteenth Amendment equal protection claim against all Defendants in their individual and official capacities ("Claim Four"), [*id.* at 25]; a fraudulent misrepresentation claim against Ms. Middleton, in her individual and official capacity, ("Claim Five"), [*id.* at 8], and an undue influence claim against Executive Director Williams, in his individual and official capacity ("Claim Six").  [*Id.* at 9].  In addition, Plaintiff seeks the following damages:

> damages . . . against all defendants in the amount of $1000.00 a day from each defendant for each day Plaintiff was without his diet (246 days) plus the correction of the canteen list to reflect Halal and Kosher [are] lawful foreach [sic] other (correctly) and no no [sic] retaliation from any of the defendants or an amount [sufficient] to compensate Plaintiff for the pain and mental anguish suffered by him due to the deliberate indifference and intentional misconduct of all defendants, together with all fees and costs and such additional relief as the Honorable Court may deem just and proper.

[*Id.* at 28].  The court construes this prayer for relief as requesting compensatory damages and punitive damages, as well as injunctive relief in the form of precluding "retaliation from any of the defendants" and "correction of the canteen list to reflect" that halal and kosher foods may be consumed by individuals on either of these religious diets.  [*Id.*].[14]

On March 18, 2021, the CDOC Defendants and the IFANCA Defendants filed separate Motions to Dismiss.  [Doc. 87; Doc. 88].  The CDOC Defendants assert numerous arguments for dismissal of Plaintiff's various claims, primarily arguing that (1) some of Mr. Smith's claims should be dismissed for lack of subject matter jurisdiction

---

[14] The court construes the Second Amended Complaint as seeking monetary relief with respect to Plaintiff's RLUIPA, free exercise, retaliation, equal protection (insofar as it can be construed as related to his religious claims), fraudulent misrepresentation, and undue influence claims and as seeking injunctive relief only with respect to Plaintiff's RLUIPA, free exercise, and retaliation claims.  *See* [Doc. 86 at 28].

pursuant to Rule 12(b)(1) on immunity grounds; (2) some of Mr. Smith's claims should be dismissed for failure to state a claim under Rule 12(b)(6); (3) the CDOC Defendants are entitled to qualified immunity on some of Mr. Smith's claims for money damages; and (4) Mr. Smith's contract and tort claims should be dismissed because they are not properly before the court.  *See* [Doc. 87 at 5-15].  In addition, the IFANCA Defendants argue that (1) this court lacks personal jurisdiction over the IFANCA Defendants and, for this reason, Plaintiff's claims against them should be dismissed pursuant to Rule 12(b)(2); and (2) Plaintiff has failed to state any claim against the IFANCA Defendants under Rule 12(b)(6) because, *inter alia*, the IFANCA Defendants are private actors and have not acted under color of state law.  [Doc. 88 at 7-14].

Mr. Smith responded to each Motion to Dismiss, *see* [Doc. 90; Doc. 91], and Defendants have since replied.  [Doc. 94; Doc. 96].  Because the Motions are ripe for recommendation, I consider the Parties' arguments below.

## LEGAL STANDARDS

### I.    Rule 12(b)(1)

Federal courts are courts of limited jurisdiction and, as such, "are duty bound to examine facts and law in every lawsuit before them to ensure that they possess subject matter jurisdiction."  *Wilderness Soc. v. Kane Cty., Utah*, 632 F.3d 1162, 1179 n.3 (10th Cir. 2011) (Gorsuch, J., concurring); *see also Cellport Sys., Inc. v. Peiker Acustic GMBH & Co. KG*, 762 F.3d 1016, 1029 (10th Cir. 2014) (explaining courts have an independent obligation to ensure subject matter jurisdiction exists).  Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, a party may bring either a facial or factual attack on subject matter jurisdiction, and a court must dismiss a complaint if it lacks subject matter

jurisdiction.  *See Pueblo of Jemez v. United States*, 790 F.3d 1143, 1147 n.4 (10th Cir.

2015).  For a facial attack, such as an assertion of Eleventh Amendment immunity, *Ruiz*

*v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002), the court takes the allegations in the

complaint as true; for a factual attack, the court may not presume the truthfulness of the

complaint's factual allegations and may consider affidavits or other documents to resolve

jurisdictional facts.  *Rural Water Dist. No. 2 v. City of Glenpool*, 698 F.3d 1270, 1272 n.1

(10th Cir. 2012).   The burden of establishing jurisdiction rests with the party asserting

jurisdiction.  *See Kline v. Biles*, 861 F.3d 1177, 1180 (10th Cir. 2017).

## II.     Rule 12(b)(6)

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim

upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In deciding a motion under

Rule 12(b)(6), the court must "accept as true all well-pleaded factual allegations . . . and

view these allegations in the light most favorable to the plaintiff."  *Casanova v. Ulibarri*,

595 F.3d 1120, 1124 (10th Cir. 2010) (quoting *Smith v. United States*, 561 F.3d 1090,

1098 (10th Cir. 2009)).  A plaintiff may not rely on mere labels or conclusions, "and a

formulistic formulaic recitation of the elements of a cause of action will not do."  *Bell*

*Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Rather, "a complaint must contain

sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its

face."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *see also Robbins v. Oklahoma*,

519 F.3d 1242, 1247 (10th Cir. 2008) (explaining that plausibility refers "to the scope of

the allegations in a complaint," and that the allegations must be sufficient to nudge a

plaintiff's claim(s) "across the line from conceivable to plausible.").   The court must

ultimately "determine whether the complaint sufficiently alleges facts supporting all the

elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

## III.    Rule 12(b)(2)

Rule 12(b)(2) of the Federal Rules of Civil Procedure allows a defendant to challenge the court's exercise of personal jurisdiction.  Fed. R. Civ. P. 12(b)(2).  The plaintiff bears the burden of demonstrating that the court has personal jurisdiction over the defendant.  *Dudnikov v. Chalk & Vermilion Fine Arts*, 514 F.3d 1063, 1069 (10th Cir. 2008).  When, as here, the court decides a Rule 12(b)(2) motion to dismiss without holding an evidentiary hearing, "the plaintiff need only make a prima facie showing of personal jurisdiction to defeat the motion."  *AST Sports Sci., Inc. v. CLF Distrib. Ltd.*, 514 F.3d 1054, 1057 (10th Cir. 2008).   "The plaintiff may make this prima facie showing by demonstrating, via affidavit or other written materials, facts that if true would support jurisdiction over the defendant."  *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1091 (10th Cir. 1998).  "The allegations of a complaint must be taken as true unless contradicted by the defendant's affidavits, . . . and to the extent that the affidavits contradict allegations in the complaint or opposing affidavits, all disputes must be resolved in the plaintiff's favor."  *Iselo Holdings, LLC v. Coonan*, No. 09-cv-02126-MSK-MJW, 2010 WL 3630125, at *3 (D. Colo. Sept. 10, 2010) (citing *Behagen v. Amateur Basketball Ass'n of U.S.A.*, 744 F.2d 731, 733 (10th Cir. 1984)).  A court may exercise general jurisdiction or specific personal jurisdiction over a defendant, depending on the defendant's degree of relation to the forum state and the relationship between the defendant's contacts with the forum and the conduct underlying the litigation.

*General Jurisdiction*.   General personal jurisdiction means that a court may exercise jurisdiction over a party "for all purposes."  *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 903 (10th Cir. 2017).  To establish general jurisdiction, the defendant's contacts with the forum state must be so "continuous and systematic" so as to render them "essentially at home" in the forum state.  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).  "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home."  *Id*. at 924.

*Specific Jurisdiction*.  Specific jurisdiction exists if the lawsuit "aris[es] out of or relat[es] to the defendant's contacts with the forum."  *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cty*., 137 S. Ct. 1773, 1780 (2017).  The specific jurisdiction analysis is two-fold.  First, the court must determine whether the defendant has sufficient minimum contacts with the forum state such that the defendant could "reasonably anticipate being haled into court there."  *Monge v. RG Petro-Mach. (Grp.) Co. Ltd.*, 701 F.3d 598, 613 (10th Cir. 2012).  This requires a showing of more than "random, fortuitous, or attenuated contacts," *see id.*; instead, the plaintiff must demonstrate that "the defendant has 'purposefully availed itself of the privilege of conducting activities or consummating a transaction in the forum state,'" *Emps. Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1160 (10th Cir. 2010) (quoting *Dudnikov*, 514 F.3d at 1071), and that "the litigation results from alleged injuries that arise out of or relate to those activities."  *Id.* (quotation omitted).  Then, if such minimum contacts exist, the court must determine whether its exercise of personal jurisdiction over the defendant would offend "traditional notions of fair play and substantial justice."  *Asahi Metal Indus. Co. v. Superior Ct. of Cal.,*

*Solano Cty.*, 480 U.S. 102, 105 (1987).  In so doing, the court evaluates whether the exercise of personal jurisdiction "is reasonable in light of the circumstances surrounding the case."  *AST Sports*, 514 F.3d at 1061.

## IV.    Pro Se Pleadings

In applying the above principles, this court is mindful that Mr. Smith proceeds pro se and the court thus affords his papers and filings a liberal construction.  *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).  But the court cannot and does not act as his advocate, *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991), and applies the same procedural rules and substantive law to Plaintiff as to a represented party.  *See Murray v. City of Tahlequah*, 312 F.3d 1196, 1199 n.2 (10th Cir. 2008); *Dodson v. Bd. of Cty. Comm'rs*, 878 F. Supp. 2d 1227, 1236 (D. Colo. 2012).

## ANALYSIS

## I.    CDOC Defendants

The CDOC Defendants raise a number of arguments attacking the sufficiency of the Second Amended Complaint.  [Doc. 87].  They argue that: (1) Plaintiff's § 1983 claims for monetary damages against the CDOC Defendants in their official capacities are barred by the Eleventh Amendment, [*id.* at 5]; (2) Plaintiff's RLUIPA claim should be dismissed insofar as it seeks monetary damages or is brought against Defendants in their individual capacities because such claims are not available under RLUIPA, [*id.* at 6]; (3) Plaintiff's RLUIPA claim should be dismissed under Rule 12(b)(6) for failure to allege a substantial burden on his religious practice, [*id.*]; (4) Plaintiff's free-exercise claim should be dismissed pursuant to Rule 12(b)(6) because Plaintiff has failed to allege a substantial burden on the exercise of his sincerely held religious beliefs, [*id.* at 9]; (5) Plaintiff's First

Amendment retaliation claim should be dismissed because he has failed to allege a causal connection between his constitutionally protected activity and Sergeant Lopez's actions, [*id.* at 11]; and (6) the CDOC Defendants are entitled to qualified immunity insofar as Plaintiff asserts claims for money damages against them.  [*Id.* at 13].  In addition, insofar as Mr. Smith asserts a fraudulent misrepresentation claim, the CDOC Defendants argue that this claim should be dismissed because Plaintiff has failed to plead compliance with the Colorado Governmental Immunity Act, [*id.* at 3 n.2], and to the extent Mr. Smith asserts an undue influence claim, CDOC Defendants argue that such claim is "made in reference to the alleged constitutional violations" and thus should be dismissed because "contract claims are not constitutional claims that may be brought pursuant to Section 1983."  [*Id.*].  The court addresses each of these arguments in turn.

## A.      Eleventh Amendment Immunity

The CDOC Defendants first argue that Plaintiff's § 1983 claims, insofar as they seek monetary damages against the CDOC Defendants in their official capacities, must be dismissed because such claims are barred under the Eleventh Amendment.  [Doc. 87 at 5].  Mr. Smith does not respond to this argument.  *See* [Doc. 90].

The Eleventh Amendment to the United States Constitution provides: "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.  This immunity extends to suits by citizens against their own state or its agencies in federal court.  *Johns v. Stewart*, 57 F.3d 1544, 1552 (10th Cir. 1995).  For claims brought pursuant to § 1983, a claim against a state official sued in his or her official capacity "is, in all respects other

than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).  Thus, the Eleventh Amendment bars suits against state officials sued in their official capacities for monetary damages pursuant to § 1983.  *See Muscogee (Creek) Nation v. Okla. Tax Comm'n*, 611 F.3d 1222, 1227 (10th Cir. 2010) (stating that § 1983 "does not abrogate a state's sovereign immunity").

Here, Mr. Smith has sued each CDOC Defendant in his or her official and his or her individual capacity, and seeks, generally, "$1000.00 a day from each defendant for each day Plaintiff was without his diet . . . or an amount [sufficient] to compensate Plaintiff for the pain and mental anguish suffered by him due to the deliberate indifference and intentional misconduct of all defendants."  [Doc. 86 at 2-4, 28].  Because Mr. Smith does not delineate for which claims he seeks such monetary damages, the court construes the Second Amended Complaint liberally and assumes that he seeks such damages for all of his claims.

As set forth above, the Eleventh Amendment prohibits claims for monetary damages against state officials in their official capacities.  *See Graham*, 473 U.S. at 165; *Ross v. Bd. of Regents of Univ. of N.M.*, 599 F.3d 1114, 1117 (10th Cir. 2010) (explaining that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983").  Accordingly, to the extent that Mr. Smith seeks monetary damages against the state for his § 1983 claims (Claims Two, Three, and Four), such claims are barred.  As a result, I respectfully **RECOMMEND** that the CDOC Defendants' Motion to Dismiss be **GRANTED** insofar as it seeks dismissal of Plaintiff's § 1983 official-capacity claims seeking monetary damages, and **RECOMMEND** that Claims Two, Three, and Four,

insofar as Mr. Smith seeks monetary relief from CDOC Defendants in their official capacities, be **DISMISSED without prejudice**.[15]

### B.    Monetary Damages and Individual-Capacity Claims Under RLUIPA

Next, the CDOC Defendants contend that "Plaintiff's claim for monetary damages under RLUIPA must be dismissed because there is no cause of action under RLUIPA for individual-capacity claims" and that the only relief available to Mr. Smith is injunctive relief against Defendants in their official capacities.  [Doc. 87 at 6].  The court construes this argument as seeking dismissal of Plaintiff's RLUIPA claim—Claim One—insofar as it (1) is asserted against the CDOC Defendants in their individual capacities or (2) seeks monetary damages.  Mr. Smith does not respond to this argument, but requests that the court "allow him to proceed [against the CDOC Defendants] in their individual and official capacti[ies] to seek . . . monetary damages."  [Doc. 90 at 14].

The court agrees with CDOC Defendants.  RLUIPA "is limited to official-capacity claims for equitable relief."  *Khan v. Barela*, 808 F. App'x 602, 605 (10th Cir. 2020) (unpublished). Indeed, the United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") has instructed that "there is no cause of action under RLUIPA for individual-capacity claims."  *Stewart v. Beach*, 701 F.3d 1322, 1335 (10th Cir. 2012); *see also* 42 U.S.C. § 2000cc-1(a) (prohibiting the "government" from imposing a substantial burden on a person's exercise of religion).  Moreover, the Supreme Court has held that Eleventh Amendment immunity bars RLUIPA claims that seek money damages.  *Sossamon v.*

---

[15] "Because Eleventh Amendment immunity is jurisdictional," dismissal on this basis is without prejudice.  *Colby v. Herrick*, 849 F.3d 1273, 1278 (10th Cir. 2017).

*Texas*, 563 U.S. 277, 293 (2011) ("We conclude that States, in accepting federal funding, do not consent to waive their sovereign immunity to private suits for money damages under RLUIPA because no statute expressly and unequivocally includes such a waiver."). For these reasons, the court finds that Plaintiff's RLUIPA claim is barred insofar as it is asserted against Defendants in their individual capacities or seeks monetary damages. Accordingly, the court respectfully **RECOMMENDS** that the Motion to Dismiss be **GRANTED** as to Claim One insofar as it seeks monetary damages or is raised against the CDOC Defendants in their individual capacities, and that this portion of Claim One be **DISMISSED**.

### C.    Free Exercise Clause and RLUIPA

Next, the CDOC Defendants assert that Mr. Smith cannot establish that the CDOC Defendants violated his right to the free exercise of his religion under the First Amendment's Free Exercise Clause or placed a substantial burden on his exercise of religion as prohibited by RLUIPA, and thus his Claims One and Two should be dismissed for failure to state a claim.  [Doc. 87 at 6, 9].  While Plaintiff must allege a substantial burden on his religious practice to state a claim in either context, *see Williams v. Wilkinson*, 645 F. App'x 692, 704 (10th Cir. 2016) (unpublished) (First Amendment); *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1312 (10th Cir. 2010) (RLUIPA), "the standards under RLUIPA are different than under the" Free Exercise Clause.  *Kay v. Bemis*, 500 F.3d 1214, 1221 (10th Cir. 2007) (remanding with instructions for district court to consider RLUIPA claim as distinct from free exercise claim).  The court thus addresses these two claims separately.  For purposes of clarity, the court first addresses Plaintiff's free exercise claim before turning to his RLUIPA claim.

*Constitutional Right to the Free Exercise of Religion*.   The Free Exercise Clause of the First Amendment, which applies to states through the Fourteenth Amendment, *see Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993), provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."   U.S. Const. amend. I.   "[I]n order to allege a constitutional violation based on a free exercise claim, a prisoner-plaintiff must survive a two-step inquiry."   *Kay*, 500 F.3d at 1218.   First, the plaintiff must allege that "a prison regulation substantially burdened" his or her sincerely held religious beliefs. *Williams*, 645 F. App'x at 704.   If the plaintiff makes such a showing, "'prison-official defendants may identify the legitimate penological interests that justified the impinging conduct,' and the court must apply a balancing test to determine the reasonableness of the regulation."   *Id.* (quoting *Kay*, 500 F.3d at 1218-19).   "But only the first of these inquiries is relevant at the motion-to-dismiss stage."   *Id.* (citing *Kay*, 500 F.3d at 1219). Indeed, the Tenth Circuit has instructed that a plaintiff "has adequately stated a First Amendment free exercise claim if the Complaint alleges that Defendants substantially burdened the exercise of his [sincerely held] belief."   *Id.*   The court may not assess the sincerity of the plaintiff's religious beliefs at the pleading stage.   *Kay*, 500 F.3d at 1219.

The Tenth Circuit has recognized that prisoners have a constitutional right to a diet conforming to their religious beliefs.   *Beerheide v. Suthers*, 286 F.3d 1179, 1185 (10th Cir. 2002).   "To determine whether the plaintiff has made an initial showing of a substantial burden on [his] religious exercise, courts use the same test under the First Amendment as is used under [RLUIPA]."   *Bertolo v. Shain*, No. 17-cv-00773-RM-KLM, 2020 WL 2365245, at *20 (D. Colo. Feb. 27, 2020), *report and recommendation adopted sub nom.*

*Bertolo v. Raemisch*, 2020 WL 1502295 (D. Colo. Mar. 30, 2020) (quotation omitted). The Tenth Circuit has defined "substantial burden," for purposes of both RLUIPA and the Free Exercise Clause, as:

> when (at the very least) the government (1) requires the plaintiff to participate in an activity prohibited by a sincerely held religious belief, (2) prevents the plaintiff from participating in an activity motivated by a sincerely held religious belief, or (3) places considerable pressure on the plaintiff to violate a sincerely held religious belief—for example, by presenting an illusory or Hobson's choice where the only realistically possible course of action available to the plaintiff trenches on sincere religious exercise.

*Yellowbear v. Lampert*, 741 F.3d 48, 55 (10th Cir. 2014).

The CDOC Defendants argue that "Mr. Smith fails to allege a plausible claim that the RDPA imposed a substantial burden on his religious exercise" because "'a prison policy that terminates an inmate's participation in a religious diet program when he violates the diet requirements does not deny his right to religious freedom.'"  [Doc. 87 at 10 (quoting *Gibson v. Zavaras*, No. 09-cv-02328-WYD-KLM, 2010 WL 2543584, at *4 (D. Colo. Jan. 22, 2010), *report and recommendation adopted*, 2010 WL 2543583 (D. Colo. June 22, 2010)].  According to the CDOC Defendants, Mr. Smith has failed to allege that the CDOC Defendants required him to "participate in an activity prohibited by his faith or [is] prohibited from participating in conduct motivated by a religious belief, nor does he allege substantial pressure in regard to either," because the RDPA simply required Mr. Smith to comply with halal requirements; according to Defendants, the termination of Mr. Smith's halal diet due to his failure to comply with the RDPA does not constitute a violation of his free exercise rights.  [*Id.* at 11].  In Response, Mr. Smith asserts that his free exercise of religion was burdened when he was "forced to go without a Halal diet," which "prevents Plaintiff from free exercise of practicing his worship of Allah (God) by the simple

act of eating a lawful (Halal) diet as ordained by Allah (God) in The Holy Qu'ran." [Doc. 90 at 12-13].

With respect to the CDOC Defendants' suggestion that Mr. Smith cannot state a free exercise claim based on the termination of his diet because the termination was the result of his violations of the RDPA, [Doc. 87 at 10-11], the court acknowledges that a number of courts have found that a plaintiff cannot establish a substantial governmental burden on his or her religious exercise based on the revocation or denial of a religious diet if such revocation or denial was penological in nature. *See, e.g.*, *Gibson*, 2010 WL 2543584, at *4; *Russell v. Wilkinson*, 79 F. App'x 175, 177 (6th Cir. 2003) (unpublished) (finding that the plaintiff failed to state a free exercise claim based on prison's failure to provide kosher means where the plaintiff's "privilege [to eat kosher meals] was revoked" for "stealing non-kosher food items" and "purchas[ing] non-kosher food from the inmate commissary"); *Harrison v. Crick*, No. 19- 81-HRW, 2020 WL 61281, at *7 (E.D. Ky. Jan. 6, 2020) (holding that the plaintiff had failed to state a claim under the First Amendment and RLUIPA where "the interference with his ability to consume Kosher foods was occasioned by [the plaintiff's] own failure to abide by the Kosher diet program's rules for participation"); *cf. Brown-El v. Harris*, 26 F.3d 68, 69-70 (8th Cir. 1994) ("Rather than burdening Ramadan worshippers, the [prison policy] allows full participation in the fast and removes from the procedures only those worshippers who choose to break the fast.").[16]

---

[16] The court notes that *Gibson*, *Russell*, and *Brown-El* were each issued in different procedural contexts than is present here. *Gibson* was issued in the context of a motion for a preliminary injunction, 2010 WL 2543584, at *4, while *Russell* and *Brown-El* took place in the summary-judgment context. *Russell*, 79 F. App'x at 175; *Brown-El*, 26 F.3d at 70.

However, as set forth above, the Tenth Circuit has instructed that whether the government's actions may be justified by a legitimate penological interest is not relevant at the pleading stage. *Williams*, 645 F. App'x at 704. Moreover, a number of courts have held that whether an alleged burden on a plaintiff's religious practice was imposed with disciplinary or penological objectives is irrelevant in determining whether a plaintiff has sufficiently alleged the existence of a substantial burden. *See, e.g.*, *McEachin v. McGuinnis*, 357 F.3d 197, 204 (2d Cir. 2004) ("[I]nmates do not forfeit their free exercise rights when the burden on their religious practice results from discipline imposed for violating prison rules."); *Borkholder v. Lemmon*, 983 F. Supp. 2d 1013, 1018-19 (N.D. Ind. 2013) (at summary judgment stage, finding that the plaintiff had "demonstrated a substantial burden to his religious practice" where his vegan diet was revoked for purchasing a non-vegan food item); *cf. Lovelace v. Lee*, 472 F.3d 174, 188 (4th Cir. 2006) (in RLUIPA context, finding that "[i]t makes no difference to this analysis that the burden on Lovelace's religious exercise resulted from discipline (punishment for his alleged infraction), rather than from the prison's failure to accommodate his religious needs in the first instance.").

Although the Tenth Circuit has not directly addressed this issue, it too has held that a prisoner's free-exercise rights may be violated by prison officials' punitive or disciplinary measures. *See Makin v. Colo. Dep't of Corrs.*, 183 F.3d 1205, 1214-15 (10th Cir. 1999) (affirming district court's judgment in favor of Muslim plaintiff on free-exercise claim where the plaintiff's housing in punitive segregation prevented him from "enjoy[ing] the full spiritual experience of Ramadan"). Moreover, the Tenth Circuit has recently, and repeatedly, made clear that, at the pleading stage, a plaintiff must allege only that the

"[d]efendants substantially burdened the exercise of his [sincerely held] religious belief." *Williams*, 645 F. App'x at 704; *see also id.* at 705 (finding that the plaintiff's allegations that (1) his request for a kosher diet was motivated by a sincerely held religious belief and (2) that defendants denied his requested accommodation were "sufficient to satisfy the first step of a First Amendment free-exercise inquiry and to survive a Rule 12(b)(6) motion").

Given the Tenth Circuit's directive that any punitive objectives purportedly underlying the substantial burden on a prisoner's religious exercise are not relevant at the motion-to-dismiss stage, the court considers only whether Mr. Smith has adequately alleged that the CDOC Defendants substantially burdened his religious exercise.[17]  The court concludes that he has.  Mr. Smith alleges that he consumes a halal diet due to his sincerely held religious beliefs, [Doc. 86 at 20, 22-23]; that his halal diet was canceled by the CDOC, [*id.* at 26]; that he informed the CDOC Defendants that he kept a halal diet for religious purposes, [*id.* at 16-17]; that after his halal diet was revoked, he requested that the diet be restored immediately, but that this request was denied, [*id.* at 17-18; Doc. 6 at 2]; and that he was instead informed that he could apply for reinstatement of his diet on January 21, 2021.  [Doc. 86 at 18].  For purposes of Rule 12(b)(6), Mr. Smith has adequately alleged a substantial burden of his sincerely held religious beliefs.  *See Williams*, 645 F. App'x at 704; *cf. Blair v. Raemisch*, 804 F. App'x 909, 918-19 (10th Cir. 2020) (unpublished) (finding allegations that prison officials provided the plaintiff with

---

[17] Because the CDOC Defendants do not make any Defendant-specific arguments as to the sufficiency of Plaintiff's allegations, *see* [Doc. 87], the court declines to parse the Second Amended Complaint to determine whether Plaintiff's claims are independently sufficiently as to each named Defendant.

inedible vegan meals, which put considerable pressure on him to abandon his religious vegan diet, were sufficient to allege a substantial burden for purposes of the First Amendment and RLUIPA).  Whether this substantial burden was imposed for legitimate penological purposes has no effect on the fact of the existence of such a burden, *McEachin*, 357 F.3d at 204, and whether such penological purposes justified the CDOC Defendants' actions is a question not properly resolved by the court at the pleading stage. *Williams*, 645 F. App'x at 704.[18]   For all of these reasons, the court respectfully **RECOMMENDS** that the Motion to Dismiss be **DENIED** insofar as it seeks dismissal of Plaintiff's free exercise claim—Claim Two—under Rule 12(b)(6).[19]

   ***RLUIPA***.  Similar to their argument seeking dismissal of Plaintiff's free exercise claim, the CDOC Defendants assert that, insofar as Plaintiff's RLUIPA claim—Claim One—is brought against them in their official capacities for injunctive relief, it should be dismissed for failure to state a claim.  [Doc. 87 at 6].  The CDOC Defendants argue that

---

[18] The court is respectfully not persuaded by the CDOC Defendants' attempt to frame Plaintiff's free-exercise claim as a claim asserting the constitutional right to eat non-halal foods.  *See* [Doc. 87 at 11].  Mr. Smith repeatedly frames his free exercise and RLUIPA claims as being based on Defendants' cancellation or revocation of his halal diet.  *See, e.g.*, [Doc. 86 at 15 (asserting that Defendants "have all contributed to the Plaintiff's religious . . . diets being terminated which has infringed upon his ability to practice his religion while incarcerated, in violation of the Free Exercise Clause of the First Amendment and [RLUIPA]"); *id.* at 22 (arguing that "[t]he Government has substantially burdened Plaintiff's religious exercise with the two-strikes policy because it required Plaintiff Smith to participate in an activity prohibited by a sincerely held religious belief . . . the eating of a Non-Halal diet.")].  Indeed, Mr. Smith concedes in his Second Amended Complaint that "if he were just wanting to eat his preferences, all he had to do was just get off the [halal] diet."  [*Id.* at 21].

[19] Due to the court's recommendation that Plaintiff's free exercise claim be dismissed insofar as it seeks monetary damages against the CDOC Defendants in their official capacities, *see supra* Section I.A, the adoption of this recommendation would permit Plaintiff's free exercise claim to go forward only insofar as it seeks injunctive relief against the CDOC Defendants in their official or individual capacities and monetary relief in their individual capacities.

the RDPA "does not place any substantial pressure on [Mr. Smith] to either engage in, or opt out of, conduct motivated by a sincerely held religious belief."  [*Id.*].  Rather, according to these Defendants, Mr. Smith was simply required to comply with the parameters of a halal diet.  [*Id.* at 6-7].  Thus, according to these Defendants, Mr. Smith's religious practice was not substantially burdened by the RDPA, but his alleged violations of the RDPA.  [*Id.* at 7-8].[20]  In response, Mr. Smith argues that the revocation of his halal diet created a substantial burden on his religious practices.  [Doc. 90 at 3-4, 12-13]; *see also* [Doc. 86 at 18 (Plaintiff alleging that, after the revocation, he was required to choose between violating his religious beliefs or not eating)].

RLUIPA prohibits the government from "impos[ing] a substantial burden on the religious exercise of a person residing in or confined to an institution . . . unless the government demonstrates that the imposition of the burden on that person . . . is in furtherance of a compelling governmental interest; and . . . is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000cc-1(a).  To state a claim under RLUIPA, a plaintiff must allege that he or she "wishes to engage in (1) a religious exercise (2) motivated by a sincerely held belief, which exercise (3) is subject to a substantial burden imposed by the government."  *Abdulhaseeb*, 600 F.3d at 1312.  CDOC Defendants challenge only the third element—whether Plaintiff has alleged that

---

[20] Again, the CDOC Defendants attempt to frame Mr. Smith's RLUIPA claim as a claim that "his consumption of the nacho chips, roast beef, and buffalo wing chips was required by his religion and that the CDOC's exclusion of these items from their Halal religious diet created a substantial burden on his ability to practice his religion."  [Doc. 87 at 8].  The court disagrees that this is the crux of Plaintiff's claim.  Mr. Smith is not asserting that Defendants violated his RLUIPA rights by precluding him from eating these foods; instead, he asserts they violated his rights by revoking his ability to keep a halal diet, and that—incidentally—such revocation was based on the wrongful classification of certain foods.  *See supra* n.18.

his religious exercise has been substantially burdened by the government.  [Doc. 87 at 7].

As set forth above, the government substantially burdens an individual's religious exercise if it requires a plaintiff to participate in an activity prohibited by a sincere religious belief, prevents the plaintiff from participating in an activity motivated by a sincere religious belief, or places considerable pressure on the plaintiff to violate a sincere religious belief.  *Yellowbear*, 741 F.3d at 55.  At the pleading stage, the court "take[s] religious claimants as [it] find[s] them, assessing the coercive impact [of] the government's actions on the individual claimant's ability to engage in a religious exercise, as he understands that exercise and the terms of his faith."  *Id*.  Similar to a free-exercise claim, "[i]t is not until the summary-judgment phase that 'the burden of proof shifts to the defendants to show the substantial burden results from a compelling governmental interest and that the government has employed the least restrictive means of accomplishing its interest.'"  *Williams*, 645 F. App'x at 699 n.13 (quoting *Abdulhaseeb*, 600 F.3d at 1318).  At the pleading stage, the Mr. Smith is "required to allege only that his request to eat a [halal] diet was motivated by a sincerely held religious belief and that his exercise of that belief has been substantially burdened by the government."  *Id.* at 699.

In his Second Amended Complaint, Plaintiff asserts that Defendants' termination of his halal diet "prevents [his] religious exercise, or at the least, places substantial pressure on [him] to not engage in his religious exercise by presenting him with a Hobson's choice—either he eats a vegan no-red meat or poultry diet in violation of his sincerely held religious beliefs, or he does not eat."  [Doc. 86 at 18].  Plaintiff's language

mirrors the Tenth Circuit's in *Abdulhaseeb*.  In *Abdulhaseeb*, the incarcerated plaintiff had repeatedly requested a halal diet from prison officials, and the requests were continually denied.  600 F.3d at 1306-08.  The Tenth Circuit, reversing summary judgment for the defendants, found a reasonable inference that the government's "failure to provide a halal diet either prevent[ed] Mr. Abdulhaseeb's religious exercise, or, at the least, place[d] substantial pressure on Mr. Abdulhaseeb not to engage in his religious exercise by presenting him with a Hobson's choice—either he eats a non-halal diet in violation of his sincerely held beliefs, or he does not eat."  *Id*. at 1317; *see also Williams*, 645 F. App'x at 702 ("[T]he failure to provide Mr. Williams with a kosher diet will either prevent him from exercising his sincerely held religious belief or force him to make the Hobson's choice of eating a diet contrary to his beliefs or not eating at all.").

*Abdulhaseeb* is somewhat distinguishable from this matter, where Mr. Smith concedes that he was initially provided a halal diet, but alleges this diet was revoked upon the CDOC Defendants' erroneous determination that he had violated the RDPA.  [Doc. 86 at 20].  However, the court does not find this distinction material here.  *See Lovelace*, 472 F.3d at 188 (finding, in the RLUIPA context, that "[i]t makes no difference" whether the burden on religion resulted from discipline").  Indeed, whether or not the government can justify its substantial burden on a religious practice is not relevant at the pleading stage.  *Williams*, 645 F. App'x at 699 n.13.  Instead, the court assesses "the coercive impact [of] the government's actions on the individual claimant's ability to engage in a religious exercise, as he understands that exercise and the terms of his faith." *Yellowbear*, 741 F.3d at 55.  Here, the court finds that such coercive impact is substantial, as Plaintiff alleges that it outright precluded him from engaging in his religious practice of

keeping a halal diet, requiring him to either contravene his religious beliefs or not eat. [Doc. 86 at 18].  The court finds that Mr. Smith has adequately alleged a substantial burden on his religious exercise for RLUIPA purposes.  *Williams*, 645 F. App'x at 703; *Blair*, 804 F. App'x at 919.

Moreover, the court cannot ignore Mr. Smith's allegations that his halal diet was <u>wrongfully</u> revoked.  *See, e.g.*, [Doc. 86 at 16, 23, 25].  The court must take these allegations as true and must draw all reasonable inferences in Mr. Smith's favor, *Brown v. Montoya*, 662 F.3d 1152, 1162 (10th Cir. 2011), and notwithstanding the fact that the court cannot consider whether the government's alleged substantial burden on Mr. Smith's religious practice was justified, the face of the Second Amended Complaint sufficiently alleges that it was not.  To hold otherwise would, in practice, permit a prison-official defendant to obtain dismissal of a plaintiff's RLUIPA claim (or free exercise claim) based solely on an assertion in a motion to dismiss that the imposition of the substantial burden was to further a compelling governmental interest or, in the free-exercise context, was justified by legitimate penological objectives; this would essentially preclude all incarcerated inmates from obtaining relief when their religious exercise has been substantially burdened by the government.  For all of these reasons, the court finds that Mr. Smith has sufficiently alleged a RLUIPA violation based on the cancellation of his halal diet, and thus **RECOMMENDS** that the Motion to Dismiss be **DENIED** insofar as it seeks dismissal of Claim One under Rule 12(b)(6).[21]

---

[21] Due to this court's above recommendation of dismissal of the RLUIPA claim insofar as it is asserted against the CDOC Defendants in their individual capacities or seeks monetary damages, *see supra* Section I.B, adoption of this recommendation would permit Plaintiff's RLUIPA claim to proceed against the CDOC Defendants only insofar as it seeks injunctive relief against CDOC Defendants in their official capacities.

D.      **First Amendment Retaliation Claim**

The CDOC Defendants next seek dismissal of Plaintiff's First Amendment retaliation claim for failure to state a claim under Rule 12(b)(6).  [Doc. 87 at 11].  They argue that Plaintiff has failed to raise factual allegations demonstrating that Sergeant Lopez's act of reporting Mr. Smith for alleged violations of his GERD diet was substantially motivated by Mr. Smith's constitutionally protected conduct.  [*Id.* at 12].  More specifically, the CDOC Defendants assert that, although Mr. Smith has *said* that Sergeant Lopez's conduct was retaliatory in nature, he has alleged no facts from which the court could infer the existence of such retaliatory motive.  [*Id.* at 13].  In his Response, Mr. Smith reiterates generally that Sergeant Lopez retaliated against him by reporting his alleged diet violations, *see* [Doc. 87 at 4-5], stating that ""[a]lmost immediately . . . after Plaintiff started the grievance process [he] received a letter from [Ms.] Crockett stating Plaintiff had violated his medical diet by ordering foods with spices in them" and that it is "plain to see the facts that show retaliation."  [*Id.* at 7].   Mr. Smith also asserts various new facts not included in the Second Amended Complaint to support his allegations of retaliation, *see, e.g.*, [*id.* at 7-8], which the court cannot consider in ruling on the Motions to Dismiss.[22]

To state a First Amendment retaliation claim, a plaintiff must allege that: (1) "the plaintiff was engaged in constitutionally protected activity," (2) "the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity," and (3) "the defendant's adverse action was

---

[22] *See Warad W., LLC v. Sorin CRM USA Inc.*, 119 F. Supp. 3d 1294, 1305 (D. Colo. 2015) ("[W]hen deciding a Rule 12(b)(6) motion, this Court may not consider new allegations contained in a plaintiff's response."); *see also In re Qwest Commc'ns Int'l, Inc.*, 396 F. Supp. 2d 1178, 1203 (D. Colo. 2004) ("The plaintiffs may not effectively amend their Complaint by alleging new facts in their response to a motion to dismiss.").

substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007).  Here, the CDOC Defendants do not argue that Plaintiff has failed to allege facts satisfying the first two elements; instead, they state that he has failed to allege facts demonstrating that Sergeant Lopez's decision to report Plaintiff for violating his medical diet was substantially motivated by Plaintiff's protected activity.  [Doc. 87 at 13].

"To satisfy the third prong of the First Amendment retaliation test, an inmate must allege specific facts showing that 'but for the retaliatory motive, the incidents to which he refers . . . would not have taken place.'" *Banks v. Katzenmeyer*, 645 F. App'x 770, 772 (10th Cir. 2016) (unpublished) (quoting *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998)).  To establish this causal connection, it is insufficient to simply state that certain acts were motivated by a retaliatory animus.  "Recitation of the acts done to plaintiffs . . . does not satisfy the requirement of showing how those acts are connected to plaintiffs' protected activity." *Leal v. Falk*, No. 19-cv-01387-PAB-NYW, 2021 WL 1186662, at *5 (D. Colo. Mar. 29, 2021).  Instead, "[a]n inmate claiming retaliation must 'allege specific facts showing retaliation because of the exercise of the prisoner's constitutional rights.'" *Peterson*, 149 F.3d at 1144 (quoting *Frazier v. Dubois*, 922 F.2d 560, 562 n.1 (10th Cir. 1990) (emphasis omitted)).

The court agrees with the CDOC Defendants that, generally, the Second Amended Complaint relies on bare assertions that Sergeant Lopez's actions were retaliatory.  *See, e.g.*, [Doc. 186 at 17, 25].  However, plaintiffs alleging First Amendment retaliation often support their claims using circumstantial evidence.  *Durant v. Indep. Sch. Dist. No. 16*, 990 F.2d 560, 564 (10th Cir. 1993).  "The presentation of circumstantial evidence such

as temporal proximity, a chronology of events, or suspicious timing may be sufficient to support allegations of retaliation." *Davis v. Hoffman*, No. 03-cv-01956-WYD-BNB, 2006 WL 1409433, at *7 (D. Colo. May 18, 2006). But unless the temporal proximity between the protected activity and the adverse action is "very close," *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001), "temporal proximity between the protected speech and the alleged retaliatory conduct, without more, does not allow for an inference of a retaliatory motive." *Trant v. Oklahoma*, 754 F.3d 1158, 1170 (10th Cir. 2014). For example, the Tenth Circuit has "repeatedly held that one cannot infer causation from temporal proximity alone when the time lapse between the activity and the retaliatory act exceeds three months," *Lauck v. Campbell Cty.*, 627 F.3d 805, 815 (10th Cir. 2010)*, but has also held that "[a] six-week period between protected activity and adverse action may be sufficient, standing alone, to show causation" at the pleading stage. *Meiners v. Univ. of Kansas*, 359 F.3d 1222, 1231 (10th Cir. 2004)

In his Second Amended Complaint, Plaintiff alleges that he filed his Informal Grievance on January 23, 2020, *see* [Doc. 86 at 16], that he subsequently filed his Step 1 Grievance on an unknown date, *see* [*id.*], and that, after his Step 1 Grievance was denied, he filed his Step 2 Grievance. [*Id.* at 17]. He additionally asserts that Sergeant Lopez retaliated against him "after [he] filed his Step 2 Grievance" by reporting that Plaintiff had violated his GERD diet "by ordering foods with spices in them[] on 3/11/20." [*Id.* at 13].[23] Mr. Smith asserts that Sergeant Lopez's report "was clearly a retaliatory effort to deter Plaintiff from continuing the grievance process by [Sergeant] Lopez, by

---

[23] It is unclear from the Second Amended Complaint whether the report was made on March 11, 2020, whether Plaintiff's alleged violation of his GERD diet occurred on March 11, 2020, or both. *See* [Doc. 86 at 13].

threatening to entice Charlene Crockett to have medical discontinue Plaintiff's medical diet."  [*Id.*].

Notably, the Second Amended Complaint contains no allegations setting forth the dates on which Plaintiff filed either his Step 1 or Step 2 Grievance or the date on which Sergeant Lopez reported Mr. Smith for violating his GERD medical diet.  *See generally* [*id.*].   Nevertheless, the court must draw all reasonable inferences in Plaintiff's favor, *Brown*, 662 F.3d at 1162, and in so doing, finds that the allegations in the Second Amended Complaint adequately allege a close temporal proximity between Mr. Smith's actions and Sergeant Lopez's report.  Based on Plaintiff's allegations, the court can infer that Mr. Smith filed his Step 1 and Step 2 Grievances at some point between January 23, 2020 (the date on which Plaintiff filed his Informal Grievance), [Doc. 86 at 16], and March 11, 2020 (the date on which Mr. Smith received the letter informing him of Sergeant Lopez's report), [*id.* at 13].  Thus, even assuming that Plaintiff filed a Grievance at the beginning of this window, and Sergeant Lopez reported Plaintiff at the end of this window, Plaintiff's allegations are sufficient to allege that Sergeant Lopez's report was issued, at most, approximately six weeks after Plaintiff filed his first Grievance (notwithstanding Plaintiff's Step 2 Grievance, which would be even closer in time to Sergeant Lopez's action).[24]

---

[24] The court acknowledges that some courts have held that, where a plaintiff has failed to set forth specific dates on which protected activity or an adverse action occurred, the plaintiff has failed to state a retaliation claim.  *See, e.g.*, *Escobar v. Reid*, 668 F. Supp. 2d 1260, 1276 (D. Colo. 2009) (dismissing retaliation claim where the plaintiff gave "no dates or details" concerning his protected activity or the alleged adverse action).  However, the court must construe Plaintiff's filings liberally, and finds that Plaintiff has alleged sufficient factual allegations concerning the timeframe in which his Grievances were filed and in which Sergeant Lopez's report was made so as to reasonably infer the approximate timing of these events.  *See Inniss v. Rocky Mountain Inventory, Inc.*, 385 F. Supp. 3d

Accordingly, although a close call, this court finds that Mr. Smith has nevertheless met his burden at the pleading stage by asserting allegations which, construed in Plaintiff's favor, demonstrate a six-week period between Plaintiff's protected activity and Sergeant Lopez's report that would permit a factfinder to infer a retaliatory motive.  *See Meiners*, 359 F.3d at 1231; *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1172 (10th Cir. 2006) (plaintiff established prima facie case of retaliation by alleging she was fired six weeks after protected activity); *Guy v. Wilkie*, No. CIV-18-33-SLP, 2019 WL 11639502, at *3 (W.D. Okla. May 6, 2019) (finding allegation of six-week window between protected activity and adverse action was "certainly sufficient to survive Defendant's Rule 12(b)(6) motion").  For these reasons, the court respectfully **RECOMMENDS** that the Motion to Dismiss be **DENIED** insofar as it seeks dismissal of Plaintiff's First Amendment retaliation claim for failure to state a claim.

### E.    Qualified Immunity

In the alternative, the CDOC Defendants assert that they "are entitled to qualified immunity for the [§ 1983] claims for money damages asserted against them."  [Doc. 87 at 13].  Due to the court's above recommendations and conclusions as to the exact relief Plaintiff seeks, the court addresses the applicability of qualified immunity only as to Plaintiff's First Amendment free exercise and retaliation claims, and only insofar as those

---

1165, 1170 (D. Colo. 2019) (where the plaintiff alleged that his adverse actions *began* in February 2018 and *continued* over the following months, allegations were "sufficient at the pleading stage to raise an inference of causation through temporal proximity that merits discovery"); *see also Guy v. Wilkie*, No. CIV-18-33-SLP, 2019 WL 11639502, at *1 (W.D. Okla. May 6, 2019) (finding that the plaintiff had stated a prima facie retaliation claim by alleging that she engaged in protected activity in December 2014 because "[e]ven if [the plaintiff had] made her last complaint . . . at the beginning of December 2014, only approximately six weeks passed before [the adverse action].").

claims seek monetary damages against the CDOC Defendants in their individual capacities.[25]   The doctrine of qualified immunity protects government officials from individual liability for actions carried out while performing their duties so long as their conduct does not violate clearly established constitutional or statutory rights. *Washington v. Unified Gov't of Wyandotte Cty.*, 847 F.3d 1192, 1197 (10th Cir. 2017).   Once a defendant has asserted a defense of qualified immunity, the burden shifts to the plaintiff who must establish that (1) the defendant violated a constitutional right, and (2) the right was clearly established at the time of the defendant's action.  *Puller v. Baca*, 781 F.3d 1190, 1196 (10th Cir. 2015).  A right is clearly established if there is a Supreme Court or Tenth Circuit decision on point or if the weight of authority in other courts provides that the right is clearly established. *Washington*, 847 F.3d at 1197 (quoting *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (internal quotation marks omitted)); *DeSpain v. Uphoff*, 264 F.3d 965, 979 (10th Cir. 2001).  The purpose of the clearly established prong is to establish that a government official had sufficient notice such that he knows, or should know, what conduct will violate a constitutional right.  *See Allstate Sweeping, LLC v. Black*, 706 F.3d 1261, 1265 (10th Cir. 2012).  This is a particularized, fact-specific analysis as it presents an inquiry into whether a reasonable officer would have known, under the then-prevailing conditions, that his conduct violated a plaintiff's rights, and thus a court must take care not to define the right in too general of terms.  *Leiser v. Moore*, 903 F.3d 1137, 1140 (10th Cir. 2018).

---

[25] Should the presiding judge not adopt any portion of this Recommendation, the court is prepared to issue a supplemental Recommendation on the CDOC Defendants' qualified immunity arguments with respect to Plaintiff's other claims.

*Free Exercise Claim*.  The CDOC Defendants assert that, because Mr. Smith "has failed to plead facts demonstrating that CDOC Defendants violated his constitutional rights[,] . . . they are entitled to qualified immunity for his individual capacity claims seeking damages."  [Doc. 87 at 14].  In addition, they argue that Mr. Smith has not established that any of the alleged constitutional violations are "clearly established" because "[u]ndersigned counsel has been unable to locate Supreme Court or Tenth Circuit precent clearly establishing that an official may violate an inmate's First Amendment Free Exercise rights by enforcing a 'two-strikes' rule that revokes a religious diet upon two violations of the dietary restrictions in a 12-month period" or case law recognizing that a prison is required to "designate as halal every possible qualifying food item in the [c]anteen."  [*Id.* at 14-15].

The court is respectfully not persuaded by the CDOC Defendants' argument.  As an initial matter, the court has already found that Mr. Smith has sufficiently alleged a violation of his constitutional right to the free exercise of religion.  *See supra* Section I.C. Moreover, the court finds that, while the court must not define a constitutional right too generally, *Leiser*, 903 F.3d at 1140, it must also take care to not define the constitutional right too narrowly.  "If it defeats the qualified-immunity analysis to define the right too broadly (as the right to be free of excessive force), it defeats the purpose of § 1983 to define the right too narrowly."  *Kent v. Oakland Cty.*, 810 F.3d 384, 396 (6th Cir. 2016) (quotation omitted).  The court recognizes that defining the constitutional right at issue as simply the right to practice one's religion would be too broad for qualified-immunity purposes.  *See, e.g.*, *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) ("The general proposition, for example, that an unreasonable search or seizure violates the Fourth

Amendment is of little help in determining whether the violative nature of particular conduct is clearly established."); *Reichle v. Howards*, 566 U.S. 658, 665 (2012) ("Here, the right in question is not the general right to be free from retaliation for one's speech, but the more specific right to be free from a retaliatory arrest that is otherwise supported by probable cause.").  However, the CDOC Defendants' classification of the constitutional right to be examined—the purported right to be free from a government official's revocation of a religious diet upon two violations of a two-strikes policy during a twelve-month period, or the purported the right to have all eligible halal items on a prison canteen list designated as halal—is too narrow for the matter presently before the court.

"[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances."  *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).  "And in some cases, 'a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful.'"  *Stewart*, 701 F.3d at 1330 (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)).  Here, construing Mr. Smith's pleadings liberally and drawing all reasonable inferences in his favor, the crux of Mr. Smith's claim is that the CDOC Defendants have terminated his halal diet, which has imposed a substantial burden on his religious practice, and that this termination was wrongful or without a legitimate basis.  *See generally* [Doc. 86].[26]  The court cannot narrowly define the constitutional right at issue here as the right to be free from a prison's two-strikes policy or the right to have an accurate classification of halal food items for purchase where these

---

[26] Indeed, the court has already rejected CDOC Defendants' attempt to classify Mr. Smith's free exercise claim as asserting the right to eat non-halal foods on a halal diet. *See, e.g.*, *supra* Section I.C n.18.

issues are merely *contributory* to the actual alleged constitutional violation: a violation of Plaintiff's constitutional right to keep a religious diet.   *See* [*id.* at 9 (asserting that Defendants' decision to "wrongfully discontinue" his religious diet violated his free-exercise rights); *id.* at 12 (asserting that his free-exercise rights were violated when he was required to eat substituted meals instead of halal meals)].[27]   Indeed, the court finds that the "general constitutional rule already identified in the decisional law," i.e., the right to a religious diet, "appl[ies] with obvious clarity to the specific conduct in question." *Stewart*, 701 F.3d at 1330.  The court thus finds that the constitutional right at issue is the right to a diet that conforms to a prisoner's sincerely held religious beliefs.  *See Wiggins v. Hoisington*, No. CV 11-967 KG/KK, 2015 WL 13665442, at *5, *9 (D.N.M. Feb. 27, 2015), *report and recommendation adopted*, 2015 WL 13665424 (D.N.M. May 1, 2015) (defining the constitutional right at issue as the right to a religious diet where the plaintiff alleged his halal diet required non-processed meats and that defendants refused to provide him such a diet); *Hancock v. Cirbo*, No. 17-cv-02255-RM-NRN, 2018 WL 6605839, at *6 (D. Colo. Dec. 14, 2018), *report and recommendation adopted*, No. 17-cv-02255-RM-NYW, ECF. No. 75 (where plaintiff alleged that a prison did not allow him

---

[27] The court acknowledges that, in some portions of his Second Amended Complaint, Mr. Smith appears to challenge the fact of the RDPA itself or the wrongful classifications of certain foods.  *See, e.g.*, [Doc. 86 at 7 (asserting that his halal diet was discontinued due to erroneous halal classifications); *id.* at 20 (asserting that his ability to conform to a halal diet "is constantly put in jeopardy by CDOC's two-strikes policy"); *id.* at 21 (referencing "the problems CDOC's two-strikes policy inflicts on [M]uslims")].  However, the court must construe Plaintiff's filings liberally, which includes looking past any "confusion of various legal theories."  *Hall*, 935 F.2d at 1110.  At bottom, the court finds that Plaintiff's equal protection claim is based on the denial of his halal diet.  *See* [Doc. 86 at 22 (asserting that the two-strikes policy "required Plaintiff to participate in an activity prohibited by a sincerely [held] religious belief," i.e., "the eating of a Non-Halal diet."); *id.* at 23 (Mr. Smith alleging that his diet was wrongfully discontinued "[b]ecause the two-strikes policy was mis[-]applied by the defendants")].

to fill out a form so he could receive kosher meals and thus denied him kosher meals, finding the right to be analyzed in the qualified-immunity context was the right to receive a religious diet).

"In the Tenth Circuit, an inmate's First Amendment right to a diet conforming to his sincerely held religious beliefs has been clearly established since at least 2002, long before the events forming the basis of Plaintiff's complaints." *Wiggins*, 2015 WL 13665442, at *9; *see also Hancock*, 2018 WL 6605839, at *6 ("[I]t is clearly established Tenth Circuit law that prisoners have a constitutional right to a diet conforming to their religious beliefs, including free kosher meals.").  Given this clearly established right, the court finds that the CDOC Defendants were on notice that the wrongful revocation of an inmate's religious diet could violate that inmate's constitutional rights.  For these reasons, the court cannot conclude—at the pleading stage—that Plaintiff's free exercise claim must be dismissed on qualified-immunity grounds.  The court respectfully **RECOMMENDS** that the Motion to Dismiss be **DENIED** to the extent it seeks dismissal of Plaintiff's § 1983 free exercise claim on qualified-immunity grounds.

***Retaliation Claim***.  In addition, the CDOC Defendants assert that they are entitled to qualified immunity on Plaintiff's First Amendment retaliation claim insofar as it seeks monetary damages against Defendants in their individual capacities.  [Doc. 87 at 14].  However, beyond stating that "Mr. Smith has failed to plead facts demonstrating that CDOC Defendants violated his constitutional rights," [*id.*], the CDOC Defendants offer no argument as to why they are entitled to qualified immunity on Mr. Smith's retaliation claim.

The court has already determined that Mr. Smith has adequately alleged a violation of his First Amendment rights based on Sergeant Lopez's alleged retaliation.  *See supra*

Section I.D.   Accordingly, the court is respectfully not persuaded by the CDOC Defendants' argument that Mr. Smith has failed to allege a constitutional violation. Moreover, because the CDOC Defendants do not argue that this right was not clearly established at the time of the alleged violation, *see* [Doc. 88 at 13-15], the court declines to address this prong of the qualified-immunity analysis.  *See Sayed v. Lt. Page Virginia*, No. 16-cv-2712-WJM-MJW, 2017 WL 5248048, at *4, n.1 (D. Colo. Nov. 13, 2017), *aff'd in part, appeal dismissed in part sub nom. Sayed v. Virginia*, 744 F. App'x 542 (10th Cir. 2018) (unpublished) ("[B]ecause the Defendants mention the defense without engaging in the analysis, they have failed to raise the affirmative defense of qualified immunity.  In failing to develop this argument, they have effectively waived the affirmative defense" and recognizing that, although the burden shifts to the plaintiff to demonstrate that the law was clearly established, this burden "ha[d] been discharged by the clear violation of rights pled by the facts as alleged in Plaintiff's complaint"); *Johnson v. Soto*, No. 17-cv-02379-RBJ-NRN, 2019 WL 861380, at *5 n.5 (D. Colo. Feb. 22, 2019), *report and recommendation adopted*, 2019 WL 5698638 (D. Colo. Mar. 13, 2019) ("Sgt. Soto does not argue that Mr. Johnson fails to allege a violation of a clearly established law. Accordingly, the Court will not address this prong of the qualified immunity analysis."). Therefore, the court respectfully **RECOMMENDS** that the Motion to Dismiss be **DENIED** insofar as it seeks dismissal of Plaintiff's retaliation claim on qualified-immunity grounds.

### F.   Plaintiff's Tort, Contract, and Fourteenth Amendment Claims

Construing Plaintiff's Second Amended Complaint liberally, Plaintiff appears to raise a Fourteenth Amendment claim, brought pursuant to § 1983, against all Defendants

in their individual and official capacities,[28] a fraudulent misrepresentation claim against Ms. Middleton, and a contractual undue influence claim against Executive Director Williams.  *See* [Doc. 86 at 8-10, 25].  Indeed, Plaintiff states in his Response that he "also asserts Tort claim of Materiality of Misrepresentation—Restat [sic] 2D of Torts, § 537, Restat [sic] 2d of Contracts, § 177: When Undue Influence Make [sic] a Contract Voidable,[] and Fourteenth Amendment violation of Equal Protection Act."  [Doc. 90 at 1].  The court addresses the viability of these claims in turn.

   ***Fraudulent Misrepresentation Claim***.   In his Second Amended Complaint, Mr. Smith alleges that "he relied upon [Ms. Middleton's] fraudulent misrepresentation of what is allowed to be purchased by Muslims on the Halal religious diet," [Doc. 86 at 8], which the court liberally construes as a fraudulent misrepresentation claim under state law.  The CDOC Defendants argue that this claim should be dismissed "because [Mr. Smith] fails to plead compliance with the Colorado Governmental Immunity Act."  [Doc. 87 at 3 n.2].  Mr. Smith does not respond to this argument.  *See* [Doc. 90].

   The Colorado Government Immunity Act ("CGIA"), codified at Colo. Rev. Stat. §§ 24-10-101 to -120, applies when federal courts hear Colorado tort claims under supplemental jurisdiction, *Aspen Orthopedics & Sports Med., LLC v. Aspen Valley Hospital Dist.*, 353 F.3d 832, 838 (10th Cir. 2003), and bars actions in tort against public employees and entities, subject to certain provisions waiving immunity.  *Medina v. State*, 35 P.3d 443, 453 (Colo. 2001).  The CGIA immunizes public employees from liability in tort actions that "arise[] out of an act or omission of such employee occurring during the

---

[28] This court has already recommended that Plaintiff's Fourteenth Amendment claim be dismissed insofar as it is brought against the CDOC Defendants in their official capacities and seeks monetary damages.  *See supra* Section I.A.

performance of his duties and within the scope of his employment unless the act or omission causing injury was willful and wanton; except that no such immunity may be asserted in an action for injuries resulting from the circumstances specified in section 24-10-106(1)."  Colo. Rev. Stat. § 24-10-118(2)(a).  Section 24-10-106(1) states in relevant part that "[s]overeign immunity is waived . . . in an action for injuries resulting from: . . . (b) The operation of any public hospital, correctional facility, as defined in section 17-1-102, C.R.S., or jail by such public entity[.]"  Colo. Rev. Stat. § 24-10-106(1)(b).  Because the CDOC Defendants do not raise an argument concerning whether sovereign immunity bars Mr. Smith's tort claim against Ms. Middleton, the court declines to pass on whether Mr. Smith's claim falls within this waiver provision.

Regardless of whether public employees are afforded immunity under the CGIA, a plaintiff is required to comply with the CGIA's notice-of-claim provisions before filing an action in court.  *Garcia v. Chamjock*, No. 11-cv-00263-PAB-MEH, 2012 WL 638145, at *3 (D. Colo. Feb. 27, 2012).  Pursuant to § 24-10-109(1), a plaintiff must file written notice with the public entity or public employee "within one hundred eighty-two days after the date of discovery of the injury, regardless of whether the person knew all of the elements of a claim or of a cause of action for such injury."  Colo. Rev. Stat. § 24-10-109(1).  The issue of proper notice is a jurisdictional prerequisite to bringing any action under the CGIA and applies even when federal courts consider Colorado state law tort claims under supplemental jurisdiction.  *Maestas v. Lujan*, 351 F.3d 1001, 1013-14 (10th Cir. 2003); Colo. Rev Stat. § 24-10-109(1) ("Compliance with the provisions of this section shall be a jurisdictional prerequisite to any action brought under the provisions of this article, and failure of compliance shall forever bar any such action." (emphasis added)); *see also*

*Bassett v. Klinkler*, No. 13-cv-03391-MJW, 2014 WL 5444086, at *4 (D. Colo. Oct. 27, 2014). "When a plaintiff fails to plead compliance with the CGIA, and a court addresses the case in the context of a motion to dismiss, the court must accept as a matter of 'fact' that the plaintiff failed to comply with the notice provisions." *Aspen Orthopedics*, 353 F.3d at 840.

Upon review of the Second Amended Complaint, the court agrees with the CDOC Defendants that Mr. Smith does not allege facts showing compliance with the CGIA. The CGIA requires that the notice provide, among other information, (1) the "name and address of the claimant," (2) a "concise statement of the factual basis of the claim, including the date, time, place, and circumstances of the act . . . complained of," (3) the name of any public employee involved, (4) a "concise statement of the nature and extent of the injury claimed to have been suffered," and (5) a "statement of the amount of monetary damages that is being requested." Colo. Rev. Stat. § 24-10-109(2)(a)-(e). Although Mr. Smith alleges that he filed various prison grievances, even assuming—without deciding—that such grievances may constitute notice under the CGIA, Mr. Smith's allegations are nevertheless insufficient to demonstrate compliance with the notice requirement. Indeed, while Mr. Smith alleges that he filed a Step 1 Grievance and a Step 2 Grievance on unknown dates, [Doc. 86 at 13, 15, 17], he has not attached copies of such Grievances, and the Second Amended Complaint does not contain allegations demonstrating that such Grievances were compliant with the substantive notice requirements of the CGIA. *See generally* [*id.*]. Moreover, although Mr. Smith asserts that he filed a Step 3 Grievance on March 13, 2020, [*id.* at 14], and has submitted a copy of this Grievance, [Doc. 6 at 2], the court cannot conclude that this Grievance constitutes a

CGIA-compliant notice.  While Second Amended Complaint appears to assert the tort claim only against Ms. Middleton, *see* [Doc. 86 at 8 (referencing "[Ms.] Middleton's fraudulent misrepresentation")], the Step 3 Grievance does not mention Ms. Middleton so as to provide notice of his claim against her.  [Doc. 6 at 2].  Moreover, although the Step 3 Grievance states that Mr. Smith "want[ed] [his] Halal diet restored immediately," [*id.*], the court is not persuaded that this is sufficient to constitute a "concise statement of the nature and extent of [Mr. Smith's] injury."  Colo. Rev. Stat. § 24-10-109(2)(d).[29]  Finally, the Step 3 Grievance does not contain a specific demand for monetary damages.  *See* [Doc. 6 at 2].

For all of these reasons, the court finds that Mr. Smith has failed comply with the CGIA notice requirements and respectfully **RECOMMENDS** that the CDOC Defendants' Motion to Dismiss be **GRANTED** insofar as it seeks dismissal of this claim against Ms.

---

[29] The court acknowledges that, unlike the strict compliance standard as to the CGIA's timeliness requirement, "the adequacy of the notice's contents is subject to a *substantial compliance* standard."  *City & Cty. of Denver v. Crandall*, 161 P.3d 627, 632 (Colo. 2007) (emphasis added).  "'Substantial compliance' means that the notice is timely, in writing, and evidences a good faith effort to include each item of information set out in § 24-10-109."  *Katz v. City of Aurora*, 85 F. Supp. 2d 1012, 1031-32 (D. Colo. 2000), *aff'd*, 13 F. App'x 837 (10th Cir. 2001) (unpublished).  Due to the extent of the information set out in § 24-10-109(2)(a)-(e) which is not included in Mr. Smith's Step 3 Grievance, the court does not find that Plaintiff has made a good faith effort to include each item set out in § 24-10-109.

Middleton,[30] and further **RECOMMENDS** that Plaintiff's fraudulent misrepresentation claim be **DISMISSED without prejudice**.[31]

**Undue Influence Claim**.  In the Second Amended Complaint, Mr. Smith makes a brief reference to "undue influence," asserting that undue influence exerted during the creation of a contract will make the contract voidable and suggesting that the RDPA is a voidable contract.  [Doc. 86 at 9-10].  He appears to suggest that Executive Director Williams exerted undue influence over him in the creation of that purported contract.  [*Id.* at 9 (asserting that he was "under the domination of [Executive Director Williams] as a convicted offender at [AVCF].")].  The CDOC Defendants argue that this claim should be dismissed because, although classified as a contract claim, the claim is "made in reference to the alleged constitutional violations" and "contract claims are not constitutional claims that may be brought pursuant to Section 1983."  [Doc. 87 at 3 n.2].  Although this court does not disagree with the principle espoused by CDOC Defendants, it finds that the undue influence claim is subject to dismissal on a different ground.

Here, Judge Gallagher granted Plaintiff's motion to proceed *in forma pauperis* under § 1915.  [Doc. 15].  Under 28 U.S.C. § 1915(e), if the plaintiff has been permitted to proceed without payment of fees pursuant to 28 U.S.C. 1915(a), "[n]otwitstanding any

---

[30] Mr. Smith sues Ms. Middleton in both her individual and official capacities.  *See* [Doc. 86 at 3].  The Colorado Supreme Court has instructed that the CGIA notice requirements apply to claims asserted against public employees in their individual capacities.  "[T]he plain language of the notice-of-claim provisions unambiguously requires notice in a suit against a state employee in which the plaintiff seeks to hold the state employee personally liable, as well as a suit where recovery is from the state."  *Middleton v. Hartman*, 45 P.3d 721, 730 (Colo. 2002), *as modified on denial of reh'g* (May 13, 2002).

[31] *See T.T. ex rel. Torres v. Colorado Dep't of Hum. Servs.*, No. 17-cv-00771-KMT, 2018 WL 1311497, at *12 (D. Colo. Mar. 13, 2018) (where plaintiff failed to comply with CGIA notice requirements prior to filing tort claim, dismissing claim without prejudice for lack of subject matter jurisdiction).

filing fee, or any portion thereof, that may have been paid, the court shall dismiss [a claim] at any time if the court determines that" the plaintiff "fails to state a claim upon which relief may be granted."  28 U.S.C. § 1915(e)(2)(B)(ii); *see also Jones v. Bock*, 549 U.S. 199, 214 (2007) (a court may sua sponte dismiss a claim for failure to state a claim in *in forma pauperis* cases).  "The Court applies the same standard for determining whether a complaint fails to state a claim pursuant to Section 1915(e) . . . that the Court applies in resolving a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6)."  *Licerio v. Lamb*, No. 20-cv-00681-WJM-STV, 2021 WL 4556092, at *8 (D. Colo. July 15, 2021), *report and recommendation adopted*, 2021 WL 4167341 (D. Colo. Sept. 14, 2021).

To the extent that Mr. Smith asserts a claim for undue influence, he must "specify a contract or transaction from which he is seeking to be relieved."  *Conry v. Barker*, No. 14-cv-02672-CMA-KLM, 2015 WL 5636405, at *13 (D. Colo. Aug. 11, 2015), *report and recommendation adopted*, No. 14-CV-02672-CMA-KLM, 2015 WL 5608133 (D. Colo. Sept. 24, 2015); *see also* Restatement (Second) of Contracts § 177(2) ("If a party's manifestation of assent is induced by undue influence by the other party, the *contract is voidable* by the victim.").  However, the court finds that the allegations in the Second Amended Complaint fail to adequately plead the existence of a contract, as Mr. Smith has asserted no allegations demonstrating that the RDPA constitutes a legally binding contract.  For example, Mr. Smith fails to allege the individual with whom he allegedly entered into this contract, *cf. Tatten v. Bank of Am. Corp.*, 912 F. Supp. 2d 1032, 1041 (D. Colo. 2012) (where the plaintiff failed to allege that the defendants were contracting parties, the plaintiff had failed to establish the existence of a contract for a breach of

contract claim), nor does Mr. Smith allege the existence of a mutual promise or obligation binding both himself and the unnamed other contracting party.  *See PayoutOne v. Coral Mortg. Bankers*, 602 F. Supp. 2d 1219, 1224 (D. Colo. 2009) (in determining whether a plaintiff had alleged the existence of a contract, considering whether the facts demonstrated that the alleged contract contained a mutual promise or obligation because a contract requires "an exchange of one party's promise or performance for the other party's promise or performance").[32]  Instead, Mr. Smith's claim is based on the conclusory assertion that the RDPA is a voidable contract.  *See, e.g.*, [Doc. 86 at 10, 21].  However, "[l]egal conclusions couched as factual allegations are insufficient evidence to defeat a motion to dismiss," *Wildearth Guardians v. Pub. Serv. Co. of Colo.*, No. 09-cv-01862-ZLW-MEH, 2010 WL 1568574, at *1 (D. Colo. 2010), and the court is "not at liberty to infer the existence of a contract or its terms."  *Wibby v. Boulder Cty. Bd. of Cty. Comm'rs*, 409 P.3d 516, 521 (Colo. App. 2016).  For the above reasons, the court finds that Mr. Smith has not plausibly alleged the existence of a contract and, thus, has not sufficiently stated a claim for undue influence.

Insofar as Mr. Smith's claim could be construed as a common law fraud claim, *see Conry*, 2015 WL 5636405, at *4 n.19 (construing undue influence claim as a fraud claim where the pro se plaintiff "[did] not appear to desire to void a contract or rescind a

---

[32] Although Mr. Smith has attached a copy of the RDPA to his Second Amended Complaint, see [Doc. 86-1], there are still no allegations that allow a factfinder to conclude it has contractual force.  *Cf. Talbert v. Corr. Dental Assocs.*, No. CV 18-5112, 2020 WL 890212, at *6 (E.D. Pa. Feb. 21, 2020) (finding that the plaintiff did not allege the existence of a contract with essential terms, a breach of a contractual duty bore by any of the Defendants, nor plead prison policy terms giving the policy contractual force, and absent pleading the contract elements, holding that dismissal of his breach of contract claim was proper).

transfer"), the court finds that Mr. Smith has failed to plead such claim in compliance with the particularity requirements of Rule 9(b).  "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  This requires that the plaintiff set forth the "who, what, when, where and how of the alleged fraud."  *Jensen v. Am.'s Wholesale Lender*, 425 F. App'x 761, 763 (10th Cir. 2011) (unpublished) (quotation omitted).  Here, although Mr. Smith alleges that "he was under the domination of [Executive Director Williams] as a convicted offender in custody at [AVCF]," *see* [Doc. 86 at 9], he does not specifically allege how or when Executive Director Williams allegedly exerted undue influence over him.  Moreover, to the extent Mr. Smith attempts to assert his undue influence claim pursuant to § 1983, an undue influence claim is not recognized as a federal remedy under § 1983.  *See River N. Props., LLC v. City & Cty. of Denver*, No. 13-cv-01410-CMA-CBS, 2014 WL 7437048, at *2 (D. Colo. Dec. 30, 2014) ("To successfully state a claim under Section 1983, a plaintiff must allege the violation of an interest which is not merely created by state law, but also protected by federal law—i.e., the federal Constitution and laws of the United States.").  Indeed, "Section 1983 imposes liability solely for violations of rights protected by the Constitution and federal law, not for violations arising simply out of state tort and contract principles."  *Crawford v. Doe*, No. CIV.A. 88-1002 SSH, 1988 WL 60348, at *1 (D.D.C. May 31, 1988) (quotation omitted).

For all of these reasons, the court finds that Mr. Smith has not stated a cognizable claim arising out of any undue influence.  Accordingly, the court respectfully **RECOMMENDS** that Plaintiff's Claim Six be **DISMISSED without prejudice** for failure to state a claim.  *See* 28 U.S.C. § 1915(e)(2)(B)(ii).

***Fourteenth Amendment Claim***.  In his Second Amended Complaint, Mr. Smith references the Fourteenth Amendment just once, arguing that Sergeant Lopez committed:

> purposeful violations of Plaintiff Smith's rights as a[n] incarcerated Muslim granted him under the Free Exercise Clause of the First Amendment of the Constitution and the RLUIPA, as well as a retaliatory attempt to chill Plaintiff Smith's engagement in the grievance process **in violation of** "clearly established law" of **the Fourteenth Amendment** of the United States Constitution.

[Doc. 86 at 25 (emphasis added)].  The argument asserted by Mr. Smith while referencing the Fourteenth Amendment—i.e., the assertion that Sergeant Lopez made a "retaliatory attempt to chill" Plaintiff's speech—plainly fits within the context of the First Amendment, rather than the Fourteenth Amendment.  But in his Response, Mr. Smith confirms that he asserts a claim alleging a "Fourteenth Amendment violation of Equal Protection Act." [Doc. 90 at 1].  The CDOC Defendants, in their Reply, argue that "[t]he Second Amended Complaint does not reference an equal protection [claim] whatsoever and therefore is not properly before this Court."  [Doc. 94 at 2 n.2].  While the court agrees with Defendants that the Second Amended Complaint does not plainly assert a Fourteenth Amendment equal protection claim, the court must construe Mr. Smith's filings liberally; because Mr. Smith references the Fourteenth Amendment in his Second Amended Complaint and clarifies in his Response that his Fourteenth Amendment claim is asserted in the equal-protection context, the court thus considers whether the Second Amended Complaint sufficiently raises an equal protection claim.

The Equal Protection Clause provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  This Clause "is essentially a [directive] that all persons similarly situated should be treated

alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  To state a viable equal protection claim, a plaintiff must first make a "threshold showing" that the plaintiff was treated differently than others with whom the plaintiff was similarly situated. *Phan v. Colo. Legal Servs.*, No. 18-cv-01403-GPG, 2018 WL 10335669, at *3 (D. Colo. June 19, 2018).  In addition, the plaintiff must allege that the difference in treatment was not rationally related to a legitimate government purpose.  *Sterling v. Fed. Bureau of Prisons*, No. 06-cv-00857-WDM-CBS, 2007 WL 2045500, at *7 (D. Colo. July 9, 2007).

To sufficiently state a claim for relief, a plaintiff must inform the defendant of the basis of the plaintiff's cause of action.  *ElHelbawy v. Holder*, No. 14-cv-02032-CBS, 2015 WL 1839132, at *2 (D. Colo. Apr. 21, 2015) (complaint may be subject to dismissal if it "fails to reasonably inform the adverse party of the basis for the cause of action").  Here, the Second Amended Complaint lacks any factual allegations that would inform Defendants of the basis of Mr. Smith's equal protection claim or which could, even with liberal construction, form the basis for an equal protection claim.  For example, Mr. Smith does not identify any other individual or group with whom he is allegedly similarly situated, nor does he allege that he was treated differently than a similarly situated individual or group.  *See* [Doc. 86]; *see also Matelsky v. Gunn*, 15 F. App'x 686, 689 (10th Cir. 2001) (unpublished) ("In the absence of any specific allegations of differential treatment, [an] Equal Protection claim is patently inadequate under any of the three equal protection theories—fundamental rights, suspect classification, or 'class of one'—and [is] properly dismissed as frivolous.").  Although the court must construe Mr. Smith's filings liberally, it "may not assume that a plaintiff can prove facts that have not been alleged, or that a defendant has violated laws in ways that a plaintiff has not alleged."  *Walker v. Amling*,

No. 18-cv-00826-NYW, 2018 WL 6528135, at *3 (D. Colo. Dec. 12, 2018); *see also Gallagher v. Shelton*, 587 F.3d 1063, 1067 (10th Cir. 2009) ("[The court's] role is not to act as [a pro se litigant's] advocate.").

As set forth above, a court must dismiss a claim if it determines that the plaintiff claim "fails to state a claim upon which relief may be granted."   28 U.S.C. § 1915(e)(2)(B)(ii); *see also Reinhardt v. City of Krebs*, No. 15-cv-330-JHP, 2016 WL 4916801, at *4 (E.D. Okla. Sept. 14, 2016) (dismissing plaintiff's "entirely conclusory" § 1983 claim for failure to state a claim where the plaintiff "list[ed] multiple alleged constitutional violations but fail[ed] to tie the to any particular facts or any particular Defendant").  Because the Second Amended Complaint contains <u>no</u> assertions creating, or factual allegations supporting, a Fourteenth Amendment equal protection claim, the court respectfully **RECOMMENDS**, insofar as the Second Amended Complaint may be construed as raising a Fourteenth Amendment claim, that Claim Four be **DISMISSED without prejudice**.

Having fully resolved the arguments raised by the CDOC Defendants in their Motion to Dismiss, the court next turns to the arguments raised in the IFANCA Defendants' Motion to Dismiss.  [Doc. 88].

## II.    The IFANCA Defendants

The IFANCA Defendants argue that the Second Amended Complaint should be dismissed insofar as it raises claims against Dr. Chaudry and IFANCA because (1) the court does not have personal jurisdiction over either IFANCA Defendant; and (2) Plaintiff "fails to state any allegations that could constitute violations of § 1983, RLUIPA, or the

Free Exercise Clause" because, *inter alia*, Plaintiff has failed to allege that either IFANCA Defendant acted under the color of law.  [Doc. 86 at 7, 11].

### A.   Personal Jurisdiction

First, the IFANCA Defendants assert that Plaintiff's claims against them should be dismissed for lack of personal jurisdiction.   [*Id.* at 7].   More specifically, the IFANCA Defendants argue that the court cannot exercise general jurisdiction over either Defendant because neither Defendant is at home in Colorado.  [*Id.* at 7-8].   Moreover, they contend that specific personal jurisdiction is also lacking in this case, as the IFANCA Defendants do not have sufficient minimum contacts with the forum state so to demonstrate that they could reasonably anticipate being haled into court here.  [*Id.* at 8-10].   In response, Mr. Smith argues that this court does have personal jurisdiction over the IFANCA Defendants because "the certification given to distributors of food entrees to various entities including [the CDOC] . . . . was approved . . ., sanctioned, directed, and actively participated or cooperated in by" Dr. Chaudry and IFANCA.  [Doc. 91 at 1-2].  In addition, Mr. Smith argues that, because IFANCA "provide[s] certifications to 16 clients in the state of Colorado" and has visited those clients once per year for 39 years, IFANCA has sufficient contacts with Colorado to establish personal jurisdiction.  [*Id.* at 2].  Because Mr. Smith does not specify whether the court has general or specific personal jurisdiction over the IFANCA Defendants, the court analyzes personal jurisdiction in both contexts.

***General Jurisdiction***.  As set forth above, to establish that a party is subject to a forum state's general jurisdiction, the plaintiff must demonstrate that the defendant's contacts with the forum are sufficient to render the defendant "at home" in the forum state. *Goodyear*, 564 U.S. at 919.  "For an individual, the paradigm forum for the exercise of

general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." *Id.* at 924. An individual's domicile is the state in which the individual (1) resides and (2) intends to remain indefinitely. *See Middleton v. Stephenson*, 749 F.3d 1197, 1200 (10th Cir. 2014). As to corporate defendants, "[g]eneral jurisdiction resides in the location that the defendant is 'at home'—generally, a corporation's state of incorporation and its principal place of business—and in certain 'exceptional' cases, in other locations where the defendant's connections are similarly substantial." *Level 3 Commc'ns, LLC v. Beavex Inc.*, No. 17-cv-02392-MSK-KLM, 2018 WL 558055, at *2 (D. Colo. Jan. 25, 2018).

Mr. Smith does not allege in his Second Amended Complaint, nor argue in his Response, that Dr. Chaudry and IFANCA are "at home" in Colorado. *See* [Doc. 86; Doc. 91]. Indeed, Mr. Smith makes no allegations concerning the state in which Dr. Chaudry is domiciled, nor does he make any assertion as to IFANCA's principal place of business or state of incorporation, so as to meet his prima facie burden of demonstrating general personal jurisdiction in this matter. *See* [Doc. 86; Doc. 91]. Conversely, IFANCA Defendants have submitted a declaration from Dr. Chaudry (the "Chaudry Declaration"), [Doc. 88-1],[33] in which Dr. Chaudry avers that he lives, works, and owns property in Illinois, and was last in Colorado approximately ten to fifteen years ago. [*Id.* at ¶¶ 4-6].

---

[33] In ruling on a motion to dismiss under Rule 12(b)(2), the court may "consider affidavits and other written materials submitted by the parties." *Impact Prods., Inc. v. Impact Prods., LLC*, 341 F.Supp.2d 1186, 1189 (D. Colo. 2004); *see also Schramm v. Oaks*, 352 F.2d 143, 149 (10th Cir. 1965) ("Certainly the trial court may gather evidence on the question of jurisdiction by affidavits or otherwise in an effort to determine the facts as they exist."); 5B Wright & Miller et al., Fed. Prac. & Proc. Civ. § 1351 (3d ed.) ("The court may receive and weigh the contents of affidavits and any other relevant matter submitted by the parties to assist it in determining the jurisdictional facts.").

In addition, Dr. Chaudry, who Plaintiff himself acknowledges is the president of IFANCA, *see* [Doc. 86 at 4], avers that IFANCA is an Illinois not-for-profit corporation and that its principal place of business is in Illinois. [Doc. 88-1 at ¶¶ 9-10]. These jurisdictional facts are not contradicted by any allegation made or affidavit submitted by Mr. Smith. *See generally* [Doc. 86; Doc. 91]. In fact, Mr. Smith acknowledges in his Second Amended Complaint that IFANCA's "office is in Park Ridge, Illinois," [Doc. 86 at 14], and lists an Illinois address for Dr. Chaudry, as well. [*Id.* at 4].

With this said, Mr. Smith's failure to allege IFANCA's state of incorporation or the state in which its principal place of business sits does not necessary mean that this court cannot exercise general jurisdiction over IFANCA. Indeed, a corporate defendant may still be deemed "at home" in a forum if its affiliations with the forum state are so "continuous and systematic" as to render them at home in the forum state. *Goodyear*, 564 U.S. at 919. To determine whether a corporate defendant may be deemed "at home" in the forum state based on its contacts with the state, the Tenth Circuit considers the following factors:

> (1) whether the corporation solicits business in the state through a local office or agents; (2) whether the corporation sends agents into the state on a regular basis to solicit business; (3) the extent to which the corporation holds itself out as doing business in the forum state, through advertisements, listings or bank accounts; and (4) the volume of business conducted in the state by the corporation.

*Kuenzle v. HTM Sport-Und Freizeitgeräte AG*, 102 F.3d 453, 457 (10th Cir. 1996). Mr. Smith's Second Amended Complaint contains no allegations as to these factors, *see* [Doc. 86], and Dr. Chaudry avers that IFANCA has no offices or employees in Colorado, has no bank accounts or property in Colorado, does not regularly conduct business in Colorado, and has no contracts with prisons in Colorado, including AVCF, [Doc. 88-1 at

¶¶ 13-18], which assertions are not contradicted by any allegation or affidavit of Plaintiff. [Doc. 86; Doc. 91].

In arguing that this court has jurisdiction over the IFANCA Defendants, Mr. Smith asserts in his Response that IFANCA's "initials" are on the halal foods served by the CDOC, that IFANCA "visit[s]" its clients in Colorado "once a year" and has done so annually since 1982, and that IFANCA has been "certifying products and continuously and systematically conducting business in Colorado" for "many years."  [Doc. 91 at 2]. Dr. Chaudry acknowledges that "once a year, [IFANCA's] auditors visit clients in Colorado (and every other state where [IFANCA has] clients) to inspect their facilities in order to grant or renew halal certifications."  [Doc. 88-1 at ¶ 15].  However, even construing these allegations liberally and in Plaintiff's favor, the court cannot conclude that a corporation's yearly visit to a forum renders that corporation "at home" there.  *See Stutzman v. Rainbow Yacht Adventures Ltd.*, No. 3:06-cv-0300-K, 2007 WL 415355, at *6 (N.D. Tex. Feb. 7, 2007), *aff'd*, 265 F. App'x 402 (5th Cir. 2008) (unpublished) ("Sending employees to an annual boat show hardly constitutes continuous and systematic contacts necessary to establish personal jurisdiction over [the defendant]."); *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 317 (1945) ("[I]t has been generally recognized that the casual presence of the corporate agent or even his conduct of single or isolated items of activities in a state in the corporation's behalf are not enough to subject it to suit on causes of action unconnected with the activities there.").

Moreover, the bare allegation that IFANCA "systematically conduct[s] business in Colorado," [Doc. 91 at 2], is insufficient to demonstrate *actual* systematic and continuous contacts with the state.  *Dudnikov*, 514 F.3d at 1070 (a court accepts as true only

plausible, non-conclusory, non-speculative assertions); *Mondragon v. Nosrak LLC*, No. 19-cv-01437-CMA-NRN, 2020 WL 2395641, at *8 (D. Colo. May 11, 2020) ("It should go without saying that the mere 'transaction of business' in a state by a company headquartered elsewhere, without more, cannot form the basis for either general or specific personal jurisdiction.").  Finally, the court finds that the purported appearance of IFANCA's initials or logo on the halal food packaging served by the CDOC is insufficient to find that IFANCA is at home in Colorado, as such a finding would render IFANCA at home in every state in which IFANCA-certified foods are distributed.  *Cf. Archie v. Pop Warner Little Scholars, Inc.,* No. CV16-6603 PSG PLAX, 2017 WL 3084160, at *7 (C.D. Cal. May 12, 2017) (the presence of defendant's logos on products made or distributed in California was insufficient to confer personal jurisdiction over that defendant).

Although the court must construe Mr. Smith's filings liberally, it cannot act as his advocate, *see Hall*, 935 F.2d at 1110, and it cannot "assume the existence of facts not alleged."  *Yunker v. Dep't of Air Force*, No. CIV-09-1079-D, 2009 WL 3614448, at *1 (W.D. Okla. Oct. 30, 2009).  A pro se plaintiff must meet all requirements of substantive law, *Dodson*, 878 F. Supp. 2d at 1235, which includes setting forth facts demonstrating that the court has personal jurisdiction over the defendant.  *Rambo v. Am. S. Ins. Co.*, 839 F.2d 1415, 1417 (10th Cir. 1988) (the burden of demonstrating personal jurisdiction over the defendant lies with the plaintiff).  Accordingly, the court finds that Mr. Smith has failed to meet his burden of demonstrating that this court may exercise general jurisdiction over Dr. Chaudry or IFANCA.

**Specific Jurisdiction**.  In the alternative, the court must determine whether the Second Amended Complaint sufficiently alleges facts supporting the exercise of specific

personal jurisdiction over the IFANCA Defendants.   As set forth above, in analyzing specific personal jurisdiction, the court first determines whether the defendant has sufficient minimum contacts with the forum state"—i.e., has "purposefully availed itself of the privilege of conducting activities or consummating a transaction in the forum state," *Bartile Roofs*, 618 F.3d at 1160, such that the defendant could "reasonably anticipate being haled into court there."  *Monge*, 701 F.3d at 613.  This requires a showing that the litigation results from alleged injuries arising from the defendant's contacts with the forum. *Bartile Roofs*, 618 F.3d at 1160.  If such minimum contacts exist, the court must determine whether its exercise of personal jurisdiction over the defendant would offend the "traditional notions of fair play and substantial justice."  *Asahi Metals*, 480 U.S. at 105.

With respect to Dr. Chaudry, there are no allegations in the Second Amended Complaint alleging that he has had any contacts with the State of Colorado.  *See* [Doc. 86].  Nor has Plaintiff identified any injury at issue in this litigation that could be construed as arising out of such non-existent contacts.  *See* [*id.*].  Thus, there are presently no allegations before the court that would permit the court to exercise specific personal jurisdiction over Dr. Chaudry.   Accordingly, Mr. Smith has not met his burden of demonstrating that this court has personal jurisdiction over Dr. Chaudry.

As for IFANCA, the court again notes that the Second Amended Complaint contains no allegations as to specific contacts that IFANCA has had with Colorado.  *See* [*id.*].  At best, Plaintiff asserts that the CDOC "purchases [its] religious diet entrees from the food distributor that contracts with [the] CDOC to supply [the] CDOC with Halal and Kosher foods and [that] contracts with IFANCA for [its] religious certification of their food

products."  [*Id.* at 26].[34]  He asserts that, for this reason, the CDOC "would have to go by IFANCA's Halal and Kosher certification to avoid [a] conflict of interest with [its] religious food supplier."  [*Id.*].  In addition, in his Response, Plaintiff asserts that IFANCA has 16 clients in Colorado, that these clients use the halal certifications provided by IFANCA, that IFANCA visits those clients once per year, and that the CDOC is "one of the clients of the distributors of [the] entrees."  [Doc. 91 at 2].  Finally, Mr. Smith asserts that IFANCA's halal certifications "[were] used by [the] CDOC to wrongfully cancel Plaintiff's Halal diet."  [*Id.* at 3].

However, even construing these allegations liberally, Plaintiff has not demonstrated that specific personal jurisdiction exists over IFANCA in this case.  First, the mere presence of IFANCA clients in Colorado does not demonstrate that IFANCA has sufficient minimum contacts with the state.  While "a defendant's contacts with the forum State may be intertwined with [its] transactions or interactions with . . . other parties," a defendant's relationship with a party who resides in the forum, "standing alone, is an insufficient basis for jurisdiction."  *Walden v. Fiore*, 571 U.S. 277, 286 (2014).  Indeed, the defendant's relationship with the forum state "must arise out of contacts that the 'defendant [itself]' creates with the forum State," *id.* at 284 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)), and the court's inquiry must focus on the defendant's contacts with the forum state, "not the defendant's contacts with persons who reside there."  *Id.* at 285; *see also Leachman Cattle of Colo., LLC v. Am. Simmental Ass'n*,

---

[34] The court construes these allegations as an assertion that IFANCA has contracted with an unnamed third-party distributor, which has in turn contracted with the CDOC.

66 F. Supp. 3d 1327, 1338 (D. Colo. 2014) ("[A] defendant must purposefully avail itself of the forum *state*, not the forum state's residents.") (emphasis in original).

Dr. Chaudry avers that IFANCA has no role in supplying or providing halal food to prisons and does not have any contracts with any prisons in Colorado, which is not contradicted by Plaintiff's allegations.  Insofar as Plaintiff asserts that the CDOC is a client of one of IFANCA's unnamed Colorado clients, [Doc. 86 at 26], this vague, attenuated relationship—absent any allegations identifying such corporate middleman or describing the nature of these parties' course of dealing—is insufficient to demonstrate that IFANCA purposefully availed itself of the privilege of conducting activities in Colorado or purposefully directed its activities into Colorado, particularly where there are no allegations of Colorado-specific activity on the part of IFANCA.  "The bare fact that [a defendant] entered into a legal relationship with . . . a Colorado entity[] cannot establish sufficient contacts to satisfy the purposeful direction requirement."  *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 910 (10th Cir. 2017).

Moreover, Plaintiff has not alleged that IFANCA's act of certifying certain foods as halal or non-halal were purposefully directed at Colorado, as required to establish specific personal jurisdiction.  *See Asahi*, 480 U.S. at 112 (The 'substantial connection[]' . . . between the defendant and the forum State necessary for a finding of minimum contacts must come about by *an action of the defendant purposefully directed toward the forum State*.") (emphasis in original).  Here, Mr. Smith alleges generally that IFANCA makes halal food certifications, but does not allege that—for example—these certifications are Colorado-specific, these certifications apply only to food distributed in Colorado, or that IFANCA otherwise directs its certifications specifically to Colorado.  *See generally* [Doc.

86; Doc. 91].  To establish personal jurisdiction, "there must be an 'affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State."  *Bristol-Myers Squibb*, 137 S. Ct. at 1781 (quoting *Goodyea*r, 564 U.S. at 919).  It is insufficient to rely on a party's general actions, not directed at the forum state, to establish personal jurisdiction.  *Cf. Leachman*, 66 F. Supp. 3d at 1338 (finding no specific personal jurisdiction based on party's general publications where the plaintiff had not shown that the publications were directed at Colorado).

For all of these reasons, the court finds that Plaintiff has not met his burden of demonstrating that this court has personal jurisdiction over either of the IFANCA Defendants.  Accordingly, this court **RECOMMENDS** that Plaintiff's claims against Dr. Chaudry and IFANCA be **DISMISSED without prejudice** for lack of personal jurisdiction.[35]   However, because this court proceeds by Recommendation, it briefly addresses the IFANCA Defendants' remaining argument.

### B.    State Action

In the alternative, the IFANCA Defendants argue that the court should dismiss Plaintiff's claims against them because neither Dr. Chaudry nor IFANCA has acted under color of law and thus, Plaintiff fails to state a claim against them under § 1983 or RLUIPA. [Doc. 88 at 12-14].[36]   Mr. Smith does not respond to this argument beyond stating that

---

[35] Because this court recommends that the presiding judge find that Plaintiff has failed to demonstrate IFANCA Defendants' minimum contacts with the forum state, the first prong of the specific personal jurisdiction analysis, the court declines to pass on the second prong of the analysis—whether the exercise of personal jurisdiction over the IFANCA Defendants would offend "traditional notions of fair play and substantial justice."  *Asahi Metal*, 480 U.S. at 105.

[36] Because Plaintiff's Claims Three, Five, and Six are limited to specific Defendants, and because this court has already determined that Mr. Smith fails to state an equal protection claim, *see supra* Section I.F, the court limits its analysis here to Plaintiff's § 1983 and

Dr. Chaudry and IFANCA "are 'acting under the color of law'" or are otherwise state actors.  [Doc. 91 at 3].

Plaintiff asserts claims against the IFANCA Defendants pursuant to § 1983—alleging a violation of his right to free exercise—and RLUIPA.  [Doc. 86 at 15].  Claims arising under § 1983 or RLUIPA may be brought only against governmental actors, *see* 42 U.S.C. § 1983 (permitting claims against any person acting "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia"); *Deutsch v. Jordan*, 618 F.3d 1093, 1096 (10th Cir. 2010) (the First Amendment applies to state and local governments through the Fourteenth Amendment); 42 U.S.C. § 2000bb-1(a) (providing that the "[g]overnment shall not substantially burden a person's exercise of religion"),[37] unless the plaintiff can demonstrate that the defendant acted under color of state law.  *See Pino v. Higgs*, 75 F.3d 1461, 1465 (10th Cir. 1996) ("In order to hold a private individual liable under § 1983, it must be shown that the private person was jointly engaged with state officials in the challenged action, or has obtained significant aid from state officials, or that the private individual's conduct is in some other

RLUIPA claims.  However, the court simply notes that the Fourteenth Amendment similarly applies only to state action.  *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982) ("Because the Amendment is directed at the States, it can be violated only by conduct that may be fairly characterized as "state action.")

[37] RLUIPA defines "government," in part, as "a State, county, municipality, or other governmental entity created under the authority of a State; . . . any branch, department, agency, instrumentality, or official of an entity listed [above]; . . . any other person acting under color of State law."  42 U.S.C. § 2000cc-5(4)(A)(i)-(iii).  The Tenth Circuit and other Circuit courts have held or acknowledged that RLUIPA claims may only be brought against the government.  *See, e.g.*, *Stewart*, 701 F.3d at 1334; *Florer v. Congregation Pidyon Shevuyim, N.A.*, 639 F.3d 916, 922 (9th Cir. 2011); *Washington v. Gonyea*, 731 F.3d 143, 146 (2d Cir. 2013).

way chargeable to the State."); *see also* 42 U.S.C. § 2000cc-5(4)(A)(iii) (permitting RLUIPA claim against "any . . . person acting under color of State law").

"Determining whether particular conduct constitutes state action 'frequently admits of no easy answer.'" *Anglin v. City of Aspen*, 552 F. Supp. 2d 1229, 1240 (D. Colo. 2008) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 350 (1974)).  "In order to establish state action, a plaintiff must demonstrate that the alleged deprivation of constitutional rights was 'caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible.'" *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447 (10th Cir. 1995) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)).  In addition, the party accused of depriving a federal right "must be a person who may fairly be said to be a state actor." *Id.*  "There are four approaches to determining whether state action is present: (1) the public function test, (2) the nexus test, (3) [the] symbiotic or entwinement test, and (4) the joint action test." *Brill v. Correct Care Sols., LLC*, 286 F. Supp. 3d 1210, 1215 (D. Colo. 2018) (citing *Johnson v. Rodrigues*, 293 F.3d 1196, 1202 (10th Cir. 2002)).  "Under each of these four tests, 'the conduct allegedly causing the deprivation of a federal right' must be 'fairly attributable to the State.'" *Gallagher*, 49 F.3d at 1447 (quoting *Lugar*, 457 U.S. at 937).

Construing Plaintiff's Second Amended Complaint liberally, Mr. Smith alleges that Dr. Chaudry and IFANCA "contributed to the Plaintiff's religious and medical diets being terminated." [Doc. 86 at 15].  Specifically, he asserts that IFANCA certifies certain foods as halal and that this certification "was [definitely] used as the standard Plaintiff was falsely accused of violating." [*Id.* at 26].  Moreover, Plaintiff alleges that "[b]ecause [the]

CDOC does not acknowledge that Kosher diets are lawful for Muslims and Halal diets are lawful for Jewish people, [this] is proof that [Dr. Chaudry and IFANCA are] not following the 'Shariah' [sic] (Islamic Law) or the Holy Qur'an, or the Sunna (way and teachings) of Prophet Muhammad."   [*Id.* at 18-19].   At bottom, Plaintiff argues that the IFANCA Defendants have violated his rights under the Free Exercise Clause and RLUIPA.  [*Id.* at 19].  The court now considers whether these factual allegations satisfy any of the four tests for identifying state action.

   ***The Public Function Test***.  Under the public function test, a party will be deemed a state actor "[i]f the state delegates to a private party a function traditionally exclusively reserved to the State."   *Gallagher*, 49 F.3d at 1456.  "This is an arduous standard to satisfy," *Johnson*, 293 F.3d at 1203, because "[w]hile many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the State.'" *Flagg Bros. v. Brooks*, 436 U.S. 149, 158 (1978); *see also Doe v. Harrison*, 254 F. Supp. 2d 338, 343 (S.D.N.Y. 2003) (quotation omitted) (describing the public function test as "quite stringent" and stating that "an extraordinarily low number" of functions have been deemed public functions).  For example, "[t]raditional and exclusive functions of the state include such functions as administering public elections, operating towns, or managing city parks, but not educating children or enforcing statutory liens." *Reinhardt v. Kopcow*, 65 F. Supp. 3d 1164, 1172 (D. Colo. 2014).

   Here, Mr. Smith alleges that the IFANCA Defendants have erroneously certified certain foods as halal or non-halal, and that the CDOC has received or purchased those certified foods from an unnamed third-party distributor with which it has contracted.  *See generally* [Doc. 86].  While a private company's direct provision of food to incarcerated

people pursuant to a government contract may be sufficient to meet the public function test, *see Mozden v. Helder*, No. 5:13-cv-05160, 2014 WL 2986711, at *2 (W.D. Ark. July 2, 2014) (finding that "a contracted food service provider . . . can be held liable under § 1983 as a state actor because, in that situation, the food service provider has assumed the state's constitutional obligation to provide a nutritionally adequate diet to inmates" and citing cases), Plaintiff notably does <u>not</u> allege that the IFANCA Defendants have contracted with the CDOC or otherwise directly provide the CDOC's inmates with food. *See generally* [Doc. 86].  The court finds that the mere *certification* of foods as compliant or non-compliant with a religious diet is not a function which is traditionally performed by the government, as the government is traditionally uninvolved in religious matters.  *Cf. Lee v. Weisman*, 505 U.S. 577, 599 (1992) (Blackmun, J., concurring) ("Nearly half a century of review and refinement of Establishment Clause jurisprudence has distilled one clear understanding: Government may neither promote nor affiliate itself with any religious doctrine or organization, nor may it obtrude itself in the internal affairs of any religious institution.").[38]  For these reasons, the court does not find that the IFANCA Defendants may be deemed state actors under the public function test.

---

[38] While this court has located no cases discussing whether the certification of foods as compliant with a religious diet has been traditionally reserved to the government, courts have found that a private entity's decision to certify a person in a health-related profession is not a function traditionally reserved to the government, even where states relied on such certifications. *See, e.g., Gilliam v. Nat'l Comm'n for Certification of Physician Assistants, Inc.*, 727 F. Supp. 1512, 1514 (E.D. Pa. 1989), *aff'd*, 898 F.2d 140 (3d Cir. 1990) (finding that a physician assistant certification board was not a state actor even where many states relied upon such certifications in their licensing decisions); *Staudinger v. Educ. Comm'n for Foreign Med. Graduates*, No. 92 CIV. 8071 (LJF), 1993 WL 138954, at *5 (S.D.N.Y. Apr. 28, 1993) (finding no state action in private entity's certification that medical school graduates were qualified to practice medicine because, while the licensing and regulation of physicians could be considered a public function, it is not performed solely by the state).  Although factually distinct from the issue in this case, the court finds

**The Nexus Test**.  If a plaintiff demonstrates "'a sufficiently close nexus' between the government and the challenged conduct such that the conduct 'may be fairly treated as that of the state itself,'" the plaintiff may demonstrate state action via the nexus test. *Brill*, 286 F. Supp. 3d at 1215 (quoting *Jackson*, 419 U.S. at 351).  But to find that a private actor has engaged in state conduct under this test, the court must find that the state has "exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State."  *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).

Even reading Plaintiff's allegations liberally, there are simply no allegations asserting or implying that the government has exerted coercive power or has encouraged IFANCA to allegedly misclassify foods as halal or non-halal.  *See* [Doc. 86].  At best, Mr. Smith asserts that the CDOC is aware of "the methods used by [the IFANCA Defendants] to certify" halal foods.  [*Id.* at 26].  But the "mere approval of or acquiescence in the initiatives of a private party is insufficient to establish the nexus required for state action." *Gallagher*, 49 F.3d at 1450.  Finally, Plaintiff's bare conclusion, absent any supporting factual averments, that IFANCA's conduct "is purported by the state authority of the Colorado Department of Corrections" is insufficient to establish coercive power.  *Hall*, 935 F.2d at 1110.  For these reasons, Plaintiff cannot demonstrate state action through the nexus test here.  *See Mayhew v. West-Watt*, No. 09-cv-02684-PAB-CBS, 2011 WL 3236061, at *7 (D. Colo. May 9, 2011), *report and recommendation adopted*, 2011 WL 3236054 (D. Colo. July 28, 2011) (finding that allegations did not demonstrate a nexus

---

these cases—wherein a private company issues a certification and the government relies on such certification—analogous to the issue at hand.

between private actor and the government where the plaintiff had not alleged the existence of any nexus, that the state exercised coercive power over the actor, or that the state encouraged the actor).

*The Symbiotic or Entwinement Test*.  Under the symbiotic test, state action is present if "the state has so far insinuated itself into a position of interdependence with a private party that it must be recognized as a joint participant in the challenged activity." *Gallagher*, 49 F.3d at 1451 (quotation omitted).  There is "no bright-line rule for determining whether a symbiotic relationship exists between a government agency and a private entity," *id.* at 1452, but the Supreme Court "has held that extensive state regulation, the receipt of substantial state funds, and the performance of important public functions do not necessarily establish the kind of symbiotic relationship between the government and a private entity that is required for state action." *Id.* at 1451 (citing cases).

There are no allegations in the Second Amended Complaint demonstrating that the government "has insinuated itself into a position of long-term interdependence" with IFANCA. *Johnson*, 293 at 1204.  The CDOC's mere use of IFANCA's halal certifications is not enough to demonstrate such a symbiotic relationship.  *Cf. Bessey v. Spectrum Arena, L.P.*, No. 11-cv-7099, 2011 WL 6779306, at *5 (E.D. Pa. Dec. 23, 2011) (the government's limited use of an arena's parking lots did not create a symbiotic relationship between the arena and the government).  The court finds that the symbiotic relationship test is not satisfied here.

*The Joint Action Test*.  Finally, under the joint action test, "state action is . . . present if a private party is a willful participant in joint action with the State or its agents." *Gallagher*, 49 F.3d at 1453.  "[T]he focus of this test is not on long-term interdependence

between the state and the private entity." *Id.* "Instead, courts examine whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." *Id.* "[T]he mere acquiescence of a state official in the actions of a private party is not sufficient" to satisfy the joint action test. *Id.*

Notably, Mr. Smith's allegations do not assert that the CDOC and IFANCA have acted in concert. Instead, Mr. Smith asserts that the CDOC and IFANCA both separately contract with a third-party distributor—IFANCA to provide certifications for the distributor's halal entrees, and the CDOC to purpose halal entrees from the distributor. [Doc. 86 at 26]. There are not, however, any allegations that IFANCA and the CDOC have, at any time, contracted, communicated, or otherwise worked together toward an unconstitutional goal. *See Apodaca v. Mesa Cty.*, No. CV 04-1379 MV/RHS, 2005 WL 8163504, at *4 (D.N.M. Oct. 27, 2005) ("Plaintiff does not allege any communication between the parties, nor does she allege that they shared a common, unconstitutional goal. To the contrary, the Complaint suggests that Anderson merely was a passive participant in the state's process."). In addition, while Mr. Smith asserts that the CDOC is aware of the methods used by the IFANCA Defendants in certifying foods, [Doc. 86 at 26], the mere awareness of a certain action is insufficient to demonstrate a "substantial degree of cooperative action" between two actors. *Gallagher*, 49 F.3d at 1454. The court finds that Plaintiff's allegations do not establish state action via the joint action test.

For these reasons, Mr. Smith fails to state a claim against either IFANCA Defendant under Rule 12(b)(6), which provides a second independently sufficient basis to recommend that Mr. Smith's claims against the IFANCA Defendants be dismissed without prejudice. *See Baker v. Wells Fargo Bank, N.A.*, No. 19-cv-03416-RBJ-NYW,

2020 WL 5079060, at *7 (D. Colo. Aug. 3, 2020), *report and recommendation adopted*,

2020 WL 5076802 (D. Colo. Aug. 26, 2020) (recommending dismissal where there were

"no allegations in the Complaint, nor argument . . . in Response to the Motion to Dismiss,

that [the defendant was] a state actor").

**CONCLUSION**

For the reasons stated herein, this court respectfully **RECOMMENDS** that:

(1)     CDOC Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(B)(1)
        and 12(B)(6) [Doc. 87] be **GRANTED in part** and **DENIED in part**;

(2)     Plaintiff's Claim One be **DISMISSED without prejudice** insofar as it seeks
        monetary relief or seeks relief against Defendants in their official capacities;

(3)     Plaintiff's Claim Two be **DISMISSED** insofar as it seeks monetary damages
        against Defendants in their official capacities;

(4)     Plaintiff's Claim Three be **DISMISSED without prejudice** insofar as it
        seeks monetary damages against Defendants in their official capacities;

(5)     Plaintiff's Claim Four be **DISMISSED without prejudice** in its entirety;

(6)     Plaintiff's Claim Five be **DISMISSED without prejudice** in its entirety;

(7)     Plaintiff's Claim Six be **DISMISSED without prejudice** in its entirety;

(8)     Defendants Dr. Muhammad Munir Chaudry and The Islamic Food and
        Nutrition Council of America's Motion to Dismiss Plaintiff's Third Amended
        Prisoner Complaint [Doc. 88] be **GRANTED**;

(9)     Each of Plaintiff's claims against Dr. Chaudry and IFANCA be **DISMISSED**
        **without prejudice**; and

(10)    If Plaintiff wishes to amend his Second Amended Complaint, he be

**ORDERED** to move to amend his complaint within two weeks of the

presiding judge's Order.[39]

In addition, it is **ORDERED** that:

(1)    A copy of this Recommendation, marked as legal mail, be sent to the

following:

Ray A. Smith, #89988
Arkansas Valley Correctional Facility (AVCF)
12750 Highway 96 at Lane 13
Ordway, CO 81034

and

Case Manager for Ray A. Smith, #89988
Arkansas Valley Correctional Facility (AVCF)
12750 Highway 96 at Lane 13

---

[39] Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995).  A general objection that does not put the District Court on notice of the basis for the objection will not preserve the objection for *de novo* review.  "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review."  *United States v. One Parcel of Real Property Known As 2121 East 30th Street*, 73 F.3d 1057, 1060 (10th Cir. 1996).  Failure to make timely objections may bar *de novo* review by the District Judge of the Magistrate Judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge.  *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (District Court's decision to review a Magistrate Judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Refining Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the Magistrate Judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the Magistrate Judge's ruling).  *But see Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

Ordway, CO 81034

DATED:  October 13, 2021                    BY THE COURT:

_____
Nina Y. Wang
United States Magistrate Judge